UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **JIMMY ANDREWS, ET AL.** | **CIVIL ACTION NO. 65-11297** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **CITY OF MONROE, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

RULING

Pending before the Court is a Motion for Partial Relief from Judgment [Doc. No. 48] filed by Defendant Monroe City School Board ("School Board"). The School Board moves the Court to approve its plan to modify student attendance zones and assignments for certain elementary and middle schools located in the Monroe City School District ("the District").

For the following reasons, the School Board's Motion for Partial Relief from Judgment is GRANTED.

I.      FACTS AND PROCEDURAL HISTORY

The boundaries for the District are coterminous with the geographic boundaries that form the corporate limits of the City of Monroe, Louisiana ("the City"). According to the 2010 United States Census Bureau data, the City's population has decreased to 48,815 residents over the years. The racial composition of the City is 33.4% white and 63.9% black, which reflects an increase in the black population and a decrease in the white population since the last figures in 2000. In the past ten years, the City has also experienced a decrease in population in the southern part of the City, which is largely populated by black residents, and a greater growth in enrollment in the schools in the northern part of the City, which has a greater concentration of white residents. Currently, the District's student population is 85% black.

For more than 40 years, the School Board has operated the District under a desegregation decree. On August 5, 1965, a complaint was filed in the name of then minor students, Jimmy Andrews and Tommy Ray Robertson, by their mothers, against the City, the Mayor, the members of the School Board, and the Superintendent. On September 17, 1965, the Court issued a permanent injunction prohibiting Defendants from operating a bi-racial school system.

On August 1, 1969, the Court issued a desegregation decree. In this decree, the Honorable Ben C. Dawkins, Jr., approved a modified desegregation plan proposed by the School Board, which provided:

(1) Following a zoning plan proposed by the Monroe City School Board;

(2) Allowing any student in the majority race at his school to transfer to a school where he would be in the minority race;

(3) Refusing students the opportunity to transfer from a school in the District to a school under the direction of the Ouachita Parish School Board;

(4) Allowing the School Board to appoint a bi-racial advisory committee to assist in the desegregation of schools; and

(5) Submitting a plan by February 1, 1970, to accomplish full integration or desegregation of the school system.

The August 1, 1969 decree was subsequently modified on November 4, 1969; February 11, 1970; February 24, 1970[1]; July 30, 1970; July 30, 1971; January 27, 1972; August 16, 1973; August 30, 1973; August 15, 1988; June 7, 1989; July 6, 1992; April 29, 1998; August 4, 1998; December

---

[1] The February 11 and 24, 1970 modifications specifically addressed student assignments.

18, 2000; July 26, 2000; August 8, 2005; March 30, 2010; and July 25, 2011.

On February 16, 1970, the United States Department of Justice ("DOJ") intervened as amicus curiae. On May 11 1978, the Court granted DOJ's motion to formally intervene and DOJ has been active in the case since that time.

Although there have been many modifications to the desegregation decree, the origin of the current attendance zone plan dates back to at least 1981.

On July 6, 1992, the Court granted the School Board's motion for unitary status in part and declared the District unitary in the areas of facilities, extracurricular activities, and hiring and retention of teachers and administrators. The Court denied the School Board's motion in part, finding that the District was not unitary in the areas of teacher and principal assignments, student assignments, and transportation.

In July 9, 1998, Benya Marshall and Annie Faye Harris (collectively "Plaintiffs") were permitted to join the case as Plaintiffs and remain actively involved.

On December 2, 2009, the Court held a status conference with the parties to address the remaining areas in which the School Board had not been declared unitary. At that time, the DOJ and the School Board reported that they had been working amicably in an effort to reach agreement on a consent decree. Plaintiffs' counsel did not have concerns to report from his clients.

On March 26, 2010, the parties filed a proposed Consent Decree with the Court. Plaintiffs did not object. On March 30, 2010, the Court signed a Consent Order [Doc. No. 16], which again modified the August 1, 1969 Decree. The Consent Order provided for specific actions to be taken by the School Board, culminating in a review of the District's unitary status at the end of June,

2014.

On July 25, 2011, the Court issued an Order [Doc. No. 38] granting the School Board's Motion for Partial Relief from Judgment, again modifying the August 1, 1969 Decree, to provide for the reassignment of sixth grade students at Cypress Point Elementary School to Sallie Humble Elementary School for the 2011-2012 school year. Additionally, the School Board was directed to "petition the Court to approve the School Board's proposed comprehensive attendance plan for implementation prior to the commencement of the 2012-2013 school year." *Id.*

Subsequently, the School Board retained a demographer, Michael Hefner, to assist in the development of a new attendance zone plan. After Mr. Hefer completed his report and made his recommendations to the School Board, on May 25, 2012, in compliance with the Court's July 25, 2011 Order, the School Board filed the instant Motion for Partial Relief from Judgment [Doc. No. 48]. The DOJ does not oppose the proposed attendance zone plan. Plaintiffs filed an opposition memorandum [Doc. No. 51]. The School Board has also filed a reply memorandum [Doc. No. 52].

The Court conducted a status conference and hearing on the motion on June 18, 2012, and is now prepared to rule.

II.     ANALYSIS

Once a school board has been determined to have violated the Equal Protection Clause by maintaining a discriminatory dual educational system, then under *Brown v. Board of Educ. of Topeka, Shawnee County, Kan.*, 347 U.S. 483 (1954), and *Brown v. Board of Educ.*, 349 U.S. 294 (1955), the dual system must be dismantled, and the school board must "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be

eliminated root and branch." *Green v. County Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 437-38 (1968).

Despite the passage of time, a school board's duty does not end with the initial desegregation order; rather the school board has a "continuing duty to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). The district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* (citing *Green,* 391 U.S. at 439; *Raney v. Bd. of Educ.*, 391 U.S. 443, 449 (1968)).

As part of its constitutional duties, the district court must scrutinize school board actions with regard to certain areas, including student assignment. *Hull v. Quitman Cty. Bd. of Educ.*, 1 F.3d 1450, 1458 (5th Cir. 1993). The court's concern is whether any action or plan proposed by the School Board will be used to "perpetuate or reestablish the dual system." *Id.* at 1454. (citations omitted). Nevertheless, "there is no constitutional duty to achieve maximum desegregation or to achieve an ideal racial balance in the schools." *Id.* at 1455 (citations omitted). The United States Court of Appeals for the Fifth Circuit "has also recognized limits imposed upon desegregation efforts by population changes and the reality of white flight, holding that 'school officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to the private actions of those who vote with their feet.'" *Id.* (quoting *Ross v. Houston Independent Sch. District*, 699 F.2d 218, 288 (5th Cir. 1983) (other citation omitted)).

As part of its analysis, the Supreme Court has permitted district courts to only a limited use of mathematical formulas in the area of student assignments. *Swann v. Charlotte-*

*Mecklenburg Bd. of Ed.*, 402 U.S. 1, 25 (1971). Such formulas are "no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement." *Id*. at 24. Commonly, a 20% plus or minus deviation from the overall student racial percentages has been used to determine if a school is racially identifiable. *See United States v. Texas Educ. Agency*, 679 F.2d 1104, 1114 (5th Cir. 1982) (using a 20% deviation); *see also United States v. Georgia*, 171 F.3d 1333, 1338 (11th Cir. 1999) (using a 20% deviation). However, an attendance zone plan may pass Constitutional muster, even though racially identifiable schools continue to exist in the district.

Based on its continuing jurisdiction over the areas of student assignments, teacher and principal assignments, and transportation, the Court must review the proposed attendance zone plan, which would result in the following changes to student assignments and school attendance zones, effective the 2012-2013 school year:

(1) Martin Luther King, Jr. Middle School will be converted from a school that serves students in grade levels 6 through 8 to a school that serves students in grade levels 7 and 8;

(2) Sixth grade students who would otherwise be assigned to Martin Luther King, Jr. Middle School will be assigned to Berg Jones Elementary School, Jefferson Upper Elementary School or Minnie Ruffin Elementary;

(3) The current Lexington Elementary School and Sallie Humble Elementary School attendance zones will be merged to form a single attendance zone;

(4) Lexington Elementary School will be converted to a lower elementary school that serves students in grade levels pre-kindergarten through 2 who reside within the

newly formed attendance zone;

(5) Sallie Humble Elementary school will be converted to an upper elementary school that serves students in grade levels 3 through 6 who reside within the newly formed attendance zone;

(6) That section of the southern boundary of the existing Cypress Point Elementary School attendance zone that lies between U.S. Highway 165 to the west and South College Drive to the east will be modified to establish the Union-Pacific Railroad track as the new boundary;

(7) The Union Pacific Railroad track that forms the southern boundary for the Cypress Point Elementary School attendance zone will also serve as the northern boundary for Lincoln Elementary School attendance zone;

(8) Students who attended grade level 5 at Cypress Point Elementary School and who, as a consequence of the Cypress Point Elementary School - Lincoln Elementary School zone modification, will be zoned to attend Lincoln Elementary School, will be permitted to remain at Cypress Point Elementary School until such time that they complete grade level 6;

(9) Students in grade level 6 who reside within the Cypress Point Elementary School zone will be reassigned to Cypress Point Elementary School, rather than to Sallie Humble Elementary School;

Additionally, the School Board seeks authority to modify staffing assignments and transportation routes as necessary to accommodate the student reassignments and changes in attendance zones.

The School Board contends that the last comprehensive modification to the attendance

7

zones took place in 1998, but those changes and post-1998 modifications did not serve the current student population of the District. Based on the findings of the demographer, Mr. Hefner, the School Board contends that its proposed attendance zone plan would have no effect on racial demographics for Martin Luther King, Jr. Middle School, Berg Jones Elementary School, Jefferson Upper Elementary School, and Minnie Ruffin Elementary. *See* [Doc. No. 48, Exh. 3]. The students zoned to attend these elementary schools for fifth grade would simply remain at the school for sixth grade. Currently, all students attending the schools are black, and, thus, the plan does not effect any changes in the student population.

The School Board further contends that the establishment of a lower elementary school at Lexington Elementary School and an upper elementary school at Sallie Humble Elementary School will have a positive effect on desegregation efforts. The black student enrollment at Lexington Elementary School will increase from 38.1% to 45%, and the black student enrollment at Sallie Humble Elementary School will decrease from 67.6% to 53%.

The School Board finally contends that the changes at Cypress Point and Lincoln Elementary Schools will have a *de minimis* effect on desegregative efforts. All thirty-two students who are expected to be affected are black, and the School Board expects to retain the white students currently enrolled.

However, Plaintiffs object to the School Board's proposed attendance zone plan. They contend that in 1964 all schools in the southern part of the City were racially segregated and, under this plan, they will remain so, while the School Board has made the efforts to desegregate the schools in the northern part of the City. They argue that the lack of impact of the proposed attendance zone plan is precisely the problem. They argue further that the School Board must

address the disparity of programs between the schools in the northern and southern part of the City. They further suggest that the School Board reestablish a Cypress Point zone for Carroll Junior High and High Schools, extend the attendance zone for Clark Magnet School, and establish a central fifth or sixth grade school in the southern part of the City to be used for the entire system, as means of bringing more white students into schools in the southern part of the City.

In response, the School Board notes that it has communicated with Plaintiffs the specific details of its proposed plan since February 2012, but heard no objections until June 12, 2012. Substantively, the School Board rejects Plaintiffs' arguments as based on false assumptions and suppositions and ignoring the racial demographics of the City and the housing choices of its residents. The School Board points out that Mr. Hefner found that the racial makeup of students in the District is actually 85% black, in contrast to the general racial demographics of the City, and this fact limits the options for further desegregation. Further, the racial makeup of the schools in the southern part of Monroe is a reflection of the racial makeup of the families with school-age children who reside in those attendance zones, not a reflection of any actions taken by the School Board. The School Board takes issue with Plaintiffs' statements that schools in the southern part of the City do not have the same programs as schools in the northern part of the City, such as drama, because Plaintiffs fail to acknowledge that there are also programs which are only offered in the schools in the southern part of the City.

The School Board also specifically addresses the proposals suggested by Plaintiffs, pointing out that any student in the District who qualifies for the magnet program may enroll at the Carroll schools or the Clark Magnet School and that Plaintiffs have failed to address the

9

practical and logistical issues associated with creating one fifth or sixth grade for the entire District. Finally, the School Board points out that an extension of the Cypress Point Elementary zone would have an insignificant impact on desegregating schools.

In conducting its review of the School Board's proposed attendance zone plan and the potential effect on desegregation, the Court first notes that the standard mathematical formula for determining whether schools are racially identifiable is, as Mr. Hefner notes, "very limited in its usefulness." [Doc. No. 48, Exh. 3, p. 11]. Since the District has an 85% black student population, any school which has less than a 65% black student population is racially identifiable as white, but schools which have a 100% black student population are **not** considered racially identifiable. Under these facts, the School Board's proposed attendance zone plan will result in the creation of a racially identifiable school at Sallie Humble Elementary School since the black student population will decrease to 53%, but it will actually increase black student enrollment at Lexington Elementary School, which was already racially identifiable. Notably, both schools are located in the northern part of the City where there is a greater concentration of white students. However, the remainder of the schools objected to by Plaintiffs are not considered racially identifiable under the 20% deviation standard.

The very existence of one or more racially identifiable schools under a proposed attendance zone plan does not render the plan unconstitutional. "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann*, 402 U.S. at 24. Rather, the Court must look at the entirety of the plan, keeping the goals of desegregation in mind. In this case, the Court has carefully considered the proposed attendance zone plan, prepared with the assistance of

a demographer well known and respected by this Court, as well as Plaintiffs' objections. The Court finds that the proposed attendance zone plan is reasonable in light of the current housing choices of residents, racial demographics, and practical and logistical considerations. There is simply no evidence that this plan is the result of past discrimination or is designed to reestablish a dual educational system, but was, in fact, carefully prepared to address the goals of desegregation and the education of the children in the District.

Finally, the Court appreciates the concerns of Plaintiffs and remains focused on addressing all remaining unitary status issues in this case. However, the School Board has been granted unitary status in the area of extracurricular activities, and the existence of a drama program at one school versus other programs, such as the magnet programs at the Carroll schools, is simply not sufficient grounds for the Court to reject the School Board's proposed attendance zone plan out of hand. Likewise, Plaintiffs offered alternative suggestions for student assignments, but failed to present sufficient evidence, despite the opportunity to do so, which would give the Court any indication whether their suggestions were feasible and practical solutions.

### III. CONCLUSION

After considering the proposed attendance zone plan presented by the School Board, the Court finds that it is neither designed to nor does promote resegregation and that it is an appropriate method of addressing the area of student assignments. Thus, the School Board's Motion for Partial Relief from Judgment [Doc. No. 48] is GRANTED, and the Court will enter an

order granting the relief prayed for by the School Board.

MONROE, LOUISIANA, this 20th day of June, 2012.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE