UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **JIMMY ANDREWS, ET AL.** | **CIVIL ACTION NO. 65-11,297** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **MONROE CITY SCHOOL BOARD, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

### MEMORANDUM RULING ON *SUA SPONTE* CONSIDERATION OF UNITARY STATUS

This matter is before the Court for *sua sponte* consideration of whether the Monroe City School District ("the District") has achieved unitary status. The Monroe City School Board ("MCSB"), the United States Department of Justice ("DOJ"), and the individual Plaintiffs Annie Faye Harris ("Harris") and Benya F. Marshall ("Marshall") oppose a finding of full unitary status and dismissal of the case.

A hearing was held on September 21-22, 2015, in the United States District Courtroom, Monroe, Louisiana. The Court heard testimony from numerous employees of MCSB, including the Superintendent, as well as from MCSB members and Plaintiffs Harris and Marshall.

For the following reasons, the Court finds that the District has achieved unitary status in the areas of transportation and student assignments, but has not achieved unitary status in the area of teacher and principal assignments. The Court further finds that the MCSB is not in compliance with the March 30, 2010 Consent Decree [Doc. No. 16].

**I.     PROCEDURAL HISTORY**

For 50 years, the School Board has operated the District under a desegregation decree. On

August 5, 1965, a complaint was filed in the name of then-minor students, Jimmy Andrews and Tommy Ray Robertson, by their mothers, against the City of Monroe ("the City"), the Mayor, the members of the School Board, and the Superintendent. On September 17, 1965, the Court issued a permanent injunction prohibiting Defendants from operating a bi-racial school system.

On August 1, 1969, the Court issued a desegregation decree. In this decree, the Honorable Ben C. Dawkins, Jr., approved a modified desegregation plan proposed by the School Board, which provided:

(1) Following a zoning plan proposed by the Monroe City School Board;

(2) Allowing any student in the majority race at his school to transfer to a school where he would be in the minority race;

(3) Refusing students the opportunity to transfer from a school in the District to a school under the direction of the Ouachita Parish School Board;

(4) Allowing the School Board to appoint a bi-racial advisory committee to assist in the desegregation of schools; and

(5) Submitting a plan by February 1, 1970, to accomplish full integration or desegregation of the school system.

The August 1, 1969 decree was subsequently modified on November 4, 1969; February 11, 1970; February 24, 1970; August 5, 1970; July 30, 1971; January 27, 1972; August 16, 1973; August 30, 1973; August 15, 1988; June 7, 1989; July 6, 1992; April 29, 1998; August 4, 1998; December 18, 2000; July 26, 2000; August 8, 2005; March 30, 2010; July 25, 2011; and June 20, 2012.

On February 16, 1970, the DOJ intervened as amicus curiae. On May 11, 1978, the Court granted DOJ's motion to formally intervene, and DOJ has been active in the case since that time.

On July 6, 1992, the Honorable Tom Stagg granted MCSB's motion for unitary status in part and declared the District unitary in the areas of facilities, extracurricular activities, and hiring and retention of teachers and administrators. Judge Stagg denied the School Board's motion in part, finding that the District was not unitary in the areas of teacher and principal assignments, student assignments, and transportation.

On July 9, 1998, Marshall and Harris were permitted to join the case as Plaintiffs and remain actively involved.

On March 26, 2010, the parties filed a proposed Consent Decree with the Court. Plaintiffs did not object. On March 30, 2010, the Court signed a Consent Decree [Doc. No. 16], which again modified the August 1, 1969 Decree. The Consent Decree provided for specific actions to be taken by the School Board, culminating in a review of the District's unitary status at the end of June, 2014. Among other items, the parties agreed that the "District will offer the same courses at every high school in the District, including, but not limited to AP, pre-AP, Honors, Dual Enrollment, and Distance Learning courses." *Id.* Information about the course offerings was to be disseminated to junior high and middle school students beginning in the seventh grade. *Id.* Additionally, MCSB agreed to "work with the Equity Assistance Center of the Intercultural Development Research Association (IDRA) in order to ensure that all students have equitable opportunity to participate in Gifted, Honors, pre-AP, and AP programming at all schools in the District." *Id.*

On July 25, 2011, the Court issued an Order [Doc. No. 38] granting the School Board's Motion for Partial Relief from Judgment, again modifying the August 1, 1969 Decree, to provide for the reassignment of sixth grade students at Cypress Point Elementary School to Sallie Humble

Elementary School for the 2011-2012 school year. Additionally, the School Board was directed to "petition the Court to approve the School Board's proposed comprehensive attendance plan for implementation prior to the commencement of the 2012-2013 school year." *Id.*

Subsequently, MCSB retained a demographer, Michael Hefner, to assist in the development of a new attendance zone plan. After Mr. Hefner completed his report and made his recommendations to MCSB, on May 25, 2012, in compliance with the Court's July 25, 2011 Order, MCSB filed a Motion for Partial Relief from Judgment [Doc. No. 48]. The DOJ did not oppose the motion, but Plaintiffs did oppose the motion. [Doc. No. 51]. The School Board also filed a reply memorandum [Doc. No. 52].

After review, on June 20, 2012, the Court granted the motion, making certain zoning changes which are discussed more fully below. Since that time, no further zoning changes have been requested and/or approved by this Court.

Between 2010 and 2014, MCSB filed the annual October 15 status reports required by the Court's August 14, 2008 Order and the annual June 30 status reports required by the March 30, 2010 Consent Decree. Neither the DOJ nor the individual Plaintiffs raised any concerns during this time period about the *Green* factors or MCSB's compliance with the March 30, 2010 Consent Decree.

On May 13, 2014, the Court issued a minute entry [Doc. No. 75]. In that entry, the Court stated:

> The parties' March 30, 2010 Consent Decree remains pending before the Court. In its June 19, 2012 Minutes [Doc. No. 55], the Court previously instructed the parties to identify and address any unresolved issues which would prevent the Court from conducting a unitary status review on or after June 30, 2014. If the parties could not resolve the issues amicably, they were instructed to notify the Court and request a hearing. The parties have not contacted the Court about unresolved issues, nor have they requested a status conference on this topic. Accordingly, the Court anticipates

>that the parties will file a joint motion for unitary status on or after June 30, 2014. **If the Department of Justice, the Monroe City School Board, or the individual Plaintiffs have any remaining concerns about issues related to the *Green* factors, they must file a motion for a status conference immediately.**

*Id.* (emphasis added).

On July 22, 2014, the Court held a telephone status conference with the parties. At the conclusion of the conference, the Court instructed MCSB to file either a motion for unitary status or a joint status report by August 18, 2014. [Doc. No. 79]. The DOJ did not raise any concerns at that time.

On August 15, 2014, a status report [Doc. No. 80] was filed. MCSB's counsel reported that MCSB had not communicated "a desire or interest in seeking to have this Court declare the School District unitary" and had not authorized him to file a motion. Because there were contested elections for MCSB seats that fall, the Court delayed further action until after the first of the year.

On January 12, 2015, after elections were held, the Court conducted another telephone status conference. [Doc. No. 83]. Counsel for MCSB reported that a number of seats had been filled with new members and asked for further time to discuss the unitary status review with the newly-elected MCSB. The DOJ did not raise any concerns at this time.

On February 2, 2015, the Court held yet another telephone status conference with counsel. [Doc. No. 84]. Counsel for MCSB requested additional time to throughly consider and review its desegregation status. The DOJ had no objection, nor did counsel for DOJ raise any concerns.

On May 13, 2015, the Court held another telephone status conference with counsel. [Doc. No. 85]. Counsel for MCSB reported that his client did not intend to file a motion for unitary status. The DOJ requested information about the capital outlay for schools in the District. At that time, the

Court informed counsel of its intent to conduct a hearing, *sua sponte*, to consider whether the District is unitary.

On June 15, 2015, the Court held a fifth telephone status conference. [Doc. No. 86]. Although counsel reported the Court's intent to the MCSB, the Board did not wish to file a motion. The DOJ's counsel specifically informed the Court that the DOJ did not intend to take any further action. Accordingly, the Court set an evidentiary hearing for September 21, 2015, at 9:30 a.m. [Doc. No. 87]. The Court also set a pre-hearing conference for September 8, 2015.

On August 12, 2015, upon motion, the Court granted leave for Michaele Turnage Young to enroll as counsel for DOJ. [Doc. No. 91].

On August 14, 2015, at the request of counsel, the Court granted the DOJ leave to attend the pre-hearing conference by telephone. [Doc. No. 92].

On August 28, 2015, upon motion, the Court granted leave for Kelly D. Gardner to enroll as counsel for DOJ as well. [Doc. No. 95].

On September 8, 2015, the Court held a pre-hearing conference in this matter. [Doc. No. 97]. Counsel for MCSB, Douglas Lawrence and his paralegal, Kimberly Lawrence, attended in person, while counsel for the DOJ, Franz Marshall, Michaele Turnage Young, and Kelly Gardner, attended by telephone. An expert retained by MCSB, Dr. William Gordon, also attended by telephone. During this conference, Dr. Gordon informed the Court that he could not attend the hearing on the date presently set. However, the Court stated to counsel that it wished to proceed, at least in certain areas, on that date. Then, for the first time since 2010, the DOJ raised concerns about MCSB's compliance with the March 30, 2010 Consent Decree. The Court instructed counsel to work together over the following week to resolve any issues or concerns. Counsel were further instructed to email

a joint status report to Chambers no later than September 14, 2015. Mr. Marshall also raised the issue of the individual Plaintiffs who have been unrepresented since the demise of their counsel, Mr. Charles Kincade. Mr. Lawrence agreed to provide the Court with contact information for Harris and Marshall.

Following the conference, Mr. Lawrence provided the addresses for Harris and Marshall. The Clerk of Court updated the contact information, so that they would receive notice of any future filings.

On September 14, 2015, counsel emailed a joint status report to Chambers.[1] [Doc. No. 102]. In that report, they discussed the exchange of information and requested a continuance of the hearing to allow the DOJ additional time to review and analyze information. They also raised concerns about the concentration of white faculty and staff in the schools that serve the majority of the District's white students, the concentration of white students at a small number of schools, and MCSB's alleged failure to comply with the March 30, 2010 Consent Decree.

On September 15, 2015, the Court issued a minute entry [Doc. No. 98] stating that the evidentiary hearing would go forward on September 21, 2015, as scheduled.

The hearing was held on September 21-22, 2015. During those two days, the Court heard testimony from MCSB Superintendent Brent Vidrine; MCSB Transportation Manager Michael Felton, MCSB members Rodney McFarland and Brenda Shelling; MCSB Human Resources Director Phedra Brantley; Principal Patrick Taylor of Carroll High School; Principal Whitney Martin of Neville High School; Principal Tammie McDaniel of J.S. Clark Magnet Elementary School;

---

[1] The report was filed in the record on September 21, 2015.

Case 3:65-cv-11297-RGJ Document 106 Filed 09/25/15 Page 8 of 15 PageID #: 1492

Principal Toni McCarty of Lexington Elementary School[2]; former MCSB member Jessie Handy; and Plaintiffs Harris and Marshall. At the conclusion of the hearing, counsel were permitted to make closing arguments, and the Court took the matter under advisement.

## II. LAW AND ANALYSIS

When first presented with a school desegregation case, a district court is charged with determining whether or not a school board has maintained or facilitated a dual school system in violation of the Equal Protection Clause of the United States Constitution. U.S. CONST., Amend. XIV. If the district court finds such a violation, then under *Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954), and *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955), the dual system must be dismantled, and the school board must "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 437-38 (1968).

Neither a school board's nor a district court's duty ends with the initial desegregation order. Rather, there is a "continuing duty [for school officials] to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). Likewise, the district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* (citing *Green*, 391 U.S. at 439; *Raney v. Bd. of Educ.*, 391 U.S. 443, 449 (1968)); *see also Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991) (We use the term "unitary" to refer to a school district that "has done all that

---

[2] All of the principals, except Mr. Taylor, are assigned to schools with a significant number of white students, as compared to the other schools in the District.

it could to remedy the [prior] segregation caused by official action.") .

The goal of the district court is to return "schools to the control of local authorities at the earliest practicable date." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992). In discharging this duty, the district court considers the Supreme Court's "*Green* factors": (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; and (5) student assignments. *Green*, 391 U.S. at 435; *see also Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 250 (1991).

"The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Dowell*, 498 at 249-50; *Freeman*, 503 U.S. at 491; *Green*, 391 U.S. at 439; *Ross*, 699 F.2d at 225.

The consideration before the Court is whether the District has achieved unitary status in the remaining three areas of transportation, student assignments, and teacher and principal assignments. The Court has further considered the implication of MCSB's failure to fully comply with the terms of the March 30, 2010 Consent Decree.

  **A.**  **Transportation**

First, the Court considered the area of transportation.

The original desegregation decree for Monroe City was filed August 1, 1969, but did not have any specific provisions regarding transportation. Nor does there appear to be any specific provision regarding transportation in the modifications through the years. In recent years, the only reference to transportation is an order from this Court permitting the School Board to comply with state law regarding the transportation of private school students. [Doc. Nos. 27 & 28].

There are no rigid guidelines that exist by which to gauge unitary status with regard to

transportation. *Swann*, 402 U.S. at 22-31. District courts must weigh the soundness of any transportation plan in light of general desegregation concerns. However, those concerns, including the desire to eliminate one-race or majority one-race routes, must be balanced against the need to avoid routes that result in travel times or distances that are "so great as to either risk the health of the children or significantly impinge on the educational process." *Id.* at 30-31. The Supreme Court has cautioned that "the limits on time of travel will vary with many factors, but probably with none more than the age of the students." *Id.* at 31.

The Court heard testimony from the Transportation Manager, Michael Felton. His testimony demonstrates that MCSB has a non-discriminatory transportation plan which provides bus transportation to and from school to all eligible students enrolled in the District by routes that are devised based on geographical concerns, not the race of the students.

While there are one-race or predominately one-race routes, those routes exist as a result of residential housing patterns. Ultimately, the testimony and evidence show that the School Board's focus is on its ability to safely transport students in the most efficient manner, saving the students time on the bus.

Based on these facts, the Court finds that MCSB has operated and continues to operate its system-wide transportation program in a unitary manner, with no vestige of past discrimination remaining in that area of operation. It has adhered to its non-discriminatory policies and practices for many more than the requisite three years necessary to demonstrate it has attained unitary status in that area of operation. Therefore, the District is declared unitary in the area of transportation.

**B.    Student Assignments**

The 1969 Decree has three provisions affecting student assignment: (1) "[f]ollowing a zoning

plan proposed by [MCSB];" (2) "[a]llowing any student in the majority race at his school to transfer to a school where he would be in the minority race; and (3) "[r]efusing students the opportunity to transfer from a school in the Monroe City School System to a school under the direction of the Ouachita Parish School Board."

In this case, during the ensuing years, the District has become majority African-American. African-American students currently account for 86% of the District's student population, and every school in the District is majority African-American. [Doc. No. 102, Appendix A]. Thus, the second provision is inapplicable.

Additionally, there has been no evidence or complaint in the years the undersigned has supervised this case that MCSB has permitted its students to attend a school under the direction of the Ouachita Parish School Board. Thus, MCSB is in compliance, and has been for many years, with the third provision.

Finally, the Court turns to the zoning plan. MCSB has implemented a lawful, non-discriminatory student assignment policy. Most recently, in 2012, MCSB retained a demographer, Michael Hefner, to conduct a review of the zoning of the District. At that time, the District's student population was 85% black.

After Mr. Hefner completed his report and made his recommendations to the School Board, on May 25, 2012, the School Board filed a Motion for Partial Relief from Judgment [Doc. No. 48]. The DOJ did not oppose the proposed attendance zone plan. Plaintiffs filed an opposition memorandum [Doc. No. 51]. The School Board also filed a reply memorandum [Doc. No. 52].

After review, on June 20, 2012, the Court granted the motion,

(1)   reassigning sixth grade students from Martin Luther King, Jr. Middle School to either Berg

>    Jones, Jefferson Upper, or Minnie Ruffin Elementary Schools;

(2)    merging Lexington and Sallie Humble Elementary Schools, so that Lexington serves students in pre-kindergarten through second grade, and Sallie Humble serves students in third grade through sixth grade; and

(3)    modifying the boundaries relative to Cypress Point and Lincoln Elementary Schools and adding a sixth grade level to Cypress Point.

The Court further granted the School Board authority to make other changes, such as revision of bus routes to accommodate the authorized school changes.

>    In granting the School Board's motion, the Court stated as follows:

>    In conducting its review of the School Board's proposed attendance zone plan and the potential effect on desegregation, the Court first notes that the standard mathematical formula for determining whether schools are racially identifiable is, as Mr. Hefner notes, "very limited in its usefulness." [Doc. No. 48, Exh. 3, p. 11]. Since the District has an 85% black student population, any school which has less than a 65% black student population is racially identifiable as white, but schools which have a 100% black student population are **not** considered racially identifiable. Under these facts, the School Board's proposed attendance zone plan will result in the creation of a racially identifiable school at Sallie Humble Elementary School since the black student population will decrease to 53%, but it will actually increase black student enrollment at Lexington Elementary School, which was already racially identifiable. Notably, both schools are located in the northern part of the City where there is a greater concentration of white students. However, the remainder of the schools objected to by Plaintiffs are not considered racially identifiable under the 20% deviation standard.

[Doc. No. 57, p. 10]. The Court further noted that "[t]he very existence of one or more racially identifiable schools under a proposed attendance zone plan does not render the plan unconstitutional. . . . Rather, the Court must look at the entirety of the plan, keeping the goals of desegregation in mind." *Id.* The Court then found "the proposed attendance zone plan . . . reasonable in light of the

current housing choices of residents, racial demographics, and practical and logistical considerations. There is simply no evidence that this plan is the result of past discrimination or is designed to reestablish a dual educational system, but was, in fact, carefully prepared to address the goals of desegregation and the education of the children in the District." *Id.* at p. 11.

Since that time, the Court has not been presented with any further requests for zoning changes or for reassignment of students, has not received any complaints about zoning or student assignments, and has not received any evidence to indicate that the current plan for student assignments, which has been in place for over three years now, was not the most reasonable plan to address the goals of desegregation. Further, during the two days of testimony, the Court heard no evidence to suggest that another zoning plan is more feasible or would have a better chance of successfully desegregating the District. Under these facts and circumstances, the Court finds that the District is also unitary in the area of student assignments.

   C.   **Teacher and Principal Assignments**

With regard to teacher and principal assignments, MCSB is required by modifications to the original Consent Decree to comply with the Fifth Circuit's decision in *Singleton v. Jackson Municipal Sch. Dist.*, 419 F.2d 1211 (5th Cir. 1969), and, consistent with *Singleton*, to adopt a policy which would distribute white and African-American teachers evenly throughout the school system. MCSB was also required to adopt a policy whereby staff and employees would be treated on a non-discriminatory basis where race, color, and national origin would not be criteria for hiring, assigning, promoting, paying, demoting, or dismissing employees.

While MCSB has a non-discrimination policy, and there appears to be no issue with that aspect of the Consent Decrees or the Court's Orders, it was clear during the two days of testimony

that administrators and principals are either unaware of the requirements of the Consent Orders, or have taken no affirmative steps to address these issues.[3]

As of October 2014, MCSB employed 449 teachers with a racial makeup of 47.7% African-American, 49.0% white, and 3.3% other races. District-wide, however, white teachers are disproportionately assigned to schools with larger white student populations. For example, at Lexington Elementary School, which has a white student population of 44.9%, the racial makeup of teachers is 77% white and 23% African-American. In contrast, at Barkdull Faulk Elementary, which has a white student population of less than 1% (2 white students), the racial makeup of teachers is 33% white and 67% African-American. Similarly, on the high school level, Neville High School, a formerly white school prior to desegregation, has a white student population of 34.2% and an African-American student population of 60.8%, and the racial makeup of its teachers is 71% white and 20% African-American. At Carroll High School, which has a white student population of less than 1% (1 student), the racial makeup of teachers is 23% white, 67% African-American, and 10% other races.

With regard to principal assignments, the Court finds evidence of the same pattern.

Accordingly, based on the evidence and testimony presented at the hearing, the Court declines to find the District unitary in the area of principal and teacher assignments.

### D. March 30, 2010 Consent Decree

In addition to the *Green* factors, the DOJ argues that the District should not be declared unitary because of its failure to comply with the provisions of the March 30, 2010 Consent Decree

---

[3]To be clear, the Court does not believe that administrators and principals are refusing to comply with the requirements of desegregation, but that they are unaware of the requirements or they are unaware of the procedures necessary to comply with the requirements.

[Doc. No. 16]. The evidence and testimony at the hearing were clear that MCSB has not fully complied with the order. Accordingly, for this additional reason, the Court finds that the District is not achieved unitary status at this time.

### III.  ACTION REQUIRED BY THE PARTIES

In light of the Court's findings, the parties shall exchange any necessary information and documentation and confer on these remaining issues. No later than November 20, 2015, they shall either file a jointly proposed consent decree, or they shall file a status report indicating that no agreement can be reached. If no agreement is reached and if appropriate, the Court will hold another hearing on December 7, 2015, at 9:00 a.m. It is the intent of the Court that the parties work together to on a plan to address all remaining issues for implementation prior to the 2016-2017 school year.

### IV.  CONCLUSION

For the foregoing reasons, the District is DECLARED unitary in the areas of transportation and student assignments. The District has not achieved unitary status in the area of principal and teacher assignments and has not fully complied with the March 30, 2010 Consent Order. The District shall remain under the Court's supervision at this time.

No later than November 20, 2015, the parties shall either file a jointly proposed consent decree, or they shall file a status report indicating that no agreement can be reached. If no agreement is reached and if appropriate, the Court will hold another hearing on December 7, 2015, at 9:00 a.m.

MONROE, LOUISIANA, this 25th day of September, 2015.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE