UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| JIMMY ANDREWS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | Civil Action No. 65-11297 |
| ) | |
| Plaintiff-Intervenor, ) | JUDGE ROBERT G. JAMES |
| ) | |
| v. ) | MAG. JUDGE KAREN L. HAYES |
| ) | |
| MONROE CITY SCHOOL BOARD, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**<u>CONSENT DECREE</u>**

i

## <u>TABLE OF CONTENTS</u>

I.    Overview and General Requirements ................................................................ 1

II.   Procedural History ........................................................................................... 2

III.  The Current State of the School District ......................................................... 4

    A.    Faculty and Staff Assignment ................................................................ 4

    B.    Course Offerings and Academic Placement........................................... 8

IV.   Legal Standard ................................................................................................ 10

V.    Monitoring and Oversight .............................................................................. 11

    A.    Appointment of an Independent Court Monitor.................................... 11

    B.    The District's Responsibility to Assist the Independent Court Monitor ...... 12

    C.    Fees and Costs of the Independent Court Monitor ............................... 12

    D.    Termination or Resignation of the Independent Court Monitor ................. 13

VI.   Remedial Measures......................................................................................... 13

    A.    Teacher and Principal Assignments ..................................................... 13

        1.    Requirements ............................................................................. 14

        2.    Implementation .......................................................................... 17

        3.    Records Maintenance ................................................................. 19

    B.    Equitable Access to Course Offerings ................................................. 19

    C.    Equitable Access to Specialized Academic Programs ......................... 23

        1.    Requirements ............................................................................. 23

        2.    Reporting ................................................................................... 27

    D.    Medical Magnet Program ..................................................................... 27

      1.      Requirements ................................................................... 27

      2.      Reporting ......................................................................... 28

VII.    Reporting ................................................................................... 29

    A.     Requirements for All Reports.................................................... 30

    B.     Additional Requirements for the January 31 and June 30 Reports............ 31

VIII.   Termination of Judicial Supervision ............................................. 33

IX.     Effect of Prior Orders ................................................................. 34

X.      APPENDIX A ............................................................................ 36

Pursuant to the Court's September 25, 2015 Order, ECF No. 107, Plaintiff-Intervenor United States of America ("United States") and Defendant Monroe City School Board (the "District") respectfully submit this Joint Proposed Consent Decree, which clarifies the issues that remain to be addressed regarding the District's fulfillment of its affirmative desegregation obligations.  The parties agree that entry of this Consent Decree, without further litigation, is in the public interest and will facilitate both the District's fulfillment of its affirmative desegregation obligations and the termination of judicial supervision in this matter.

This Court has reviewed the terms of the Joint Proposed Consent Decree and concludes that entry of the Consent Decree is consistent with the Fourteenth Amendment to the United States Constitution and federal law, and that such entry will further the orderly desegregation of the District.

Accordingly, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.     Overview and General Requirements

A.     This Consent Decree reflects the District's obligations under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c *et seq.*, to provide educational programs and services without discriminating on the basis of race and in a manner that does not perpetuate or further the racial segregation of students.

B.     The parties agree to the terms of this Consent Decree to resolve the United States' outstanding concerns regarding faculty and staff assignment and equitable access to course offerings, including specialized academic programs.  The

1

parties anticipate that full compliance with this Decree will help support a finding that the District has complied with both the letter and spirit of the orders governing this matter, and that the vestiges of past discrimination have been eliminated to the extent practicable.  *See Freeman v. Pitts*, 503 U.S. 467, 485 (1992).

C.     This Consent Decree shall at all times be binding upon the District, including the successor members of the District's school board and successor District superintendents.

D.     By February 1, 2016, the District shall develop, and the School Board shall approve, written policies or contracts that make a material portion of the Superintendent's performance evaluation contingent on compliance with this Consent Decree.  The performance evaluations of other District personnel responsible for implementing this Decree – such as the Central Office administrator mentioned in Section VI.C.1.iii. – shall also be revised so that a material portion of those individuals' performance evaluations are contingent on their performance in implementing the relevant portions of this Decree.

## II.     Procedural History

"On August 5, 1965, Jimmy Andrews and Tommy Ray Robertson, minor children enrolled in the District, sued Defendants through their mothers, alleging racial segregation and discrimination in the operation of the Monroe City public schools."  ECF No. 16 at 1.  On September 17, 1965, the Court entered a permanent injunction prohibiting segregation.  ECF No. 16 at 1-2.  The United States entered the case in February 1970 as amicus curiae, "'with the right to submit pleadings,

2

evidence, arguments and briefs, the right to move for injunctive and other necessary and proper relief, and the right to initiate such further proceedings that may be necessary and appropriate.'"  ECF No. 16 at 2.  "On May 11, 1978, the Court granted the United States' motion for leave to intervene."  *Id.*

A July 6, 1992 order declared the District unitary with respect to facilities, extracurricular activities, and "the hiring and retention of black teachers and administrators."  Order, *Andrews v. City of Monroe Sch. Bd.*, No. 11297 (W.D. La. July 6, 1992) (Stagg, J.).  However, the Court declined to declare the District unitary with regard to "teacher and principal assignments, student assignments and transportation."  *Id.*

On March 30, 2010, the Court ordered the District to "offer the same courses at every high school in the District;" fully implement a medical magnet program at Carroll High School by the fall of the 2011-12 school year (in an attempt to increase the diversity of the student population at Carroll High); encourage each high school student "to attempt to qualify for the Tuition Opportunity Program for Students (TOPS ), which provides scholarships for qualified high school students who choose to attend a Louisiana state college or university;" "work with the Equity Assistance Center for the Intercultural Development Research Association (IDRA) in order to ensure that all students have an equitable opportunity to participate in Gifted, Honors, pre-AP, and AP programming at all schools in the District;" and ensure that all principals, other administrators, faculty and certified staff are informed of the terms of the Court's order.  ECF No. 16 at 4-7.

3

On September 25, 2015, the Court declared the District unitary with respect to student assignment and transportation, but declined to pronounce the District unitary as to teacher and principal assignments.  ECF No. 106.  In addition, the Court found that the District had not complied with the March 30, 2010 Consent Decree.  *Id.*

III.   **The Current State of the School District**[1]

The District serves approximately 8,482 students in grades K-12 (the District also serves pre-kindergartners).  The District has 12 elementary schools, three middle schools, three high schools, and one combined K-12 school.   For the 2015-16 school year, approximately 86% of the District's students are black, while 12% are white.

A.   **Faculty and Staff Assignment**

There is and has long been a disproportionate concentration of white faculty and staff in the few schools that serve the overwhelming majority of the District's white students.[2]  For example, 65% of the District's white high school administrators and teachers currently work at Neville High School, which was operated as a white school during *de jure* segregation and currently educates 98% of

---

[1]      Charts appearing in Appendix A hereto summarize information regarding the District's 2014-15 and 2015-16 student body and faculty/staff racial makeup.  Deviations of 20 percentage points or more from the District-wide racial composition for that school level (e.g. elementary v. middle v. high) appear in red shading or – when viewed in black and white – in dark grey shading.

[2]      As Judge Stagg noted in his 1992 order, the United States alleged then that "the District has assigned a disproportionate number of white teachers to schools which have a significant white student enrollment, and also a disproportionate number of black teachers to predominately black schools."  Order, *Andrews v. City of Monroe Sch. Bd.*, No. 11297, at 7 (W.D. La. July 6, 1992) (Stagg, J.).

4

the District's white high school students.  The percentage of white professionals[3] at
Neville is more than 25 percentage points higher than the percentage of white high
school professionals in the District overall.

During the 2014-15 school year, 71% of the District's white high school
teachers and 64% of the District's white high school staff worked at Neville, and
Neville educated 99% of the District's white high school students.  That year, the
percentage of white teachers at Neville was 24 percentage points higher than the
percentage of white high school teachers District-wide.  Similarly, the percentage of
black staff members at Neville was 22 percentage points lower than the percentage
of black high school staff members District-wide, while the percentage of white staff
members at Neville was 18 percentage points higher than the percentage of white
high school staff District-wide.

Neville High School appears to be the only high school in which all of its
teachers were certified during the 2014-15 school year.  *Compare* ECF No. 88-2 *with*
ECF No. 88-1 (showing that 11% of the 53 teachers at Carroll High School – a black
school under *de jure* segregation that currently educates a student body that is 99%
black – were not certified during the 2014-15 school year) *and* ECF No. 88-3
(showing that 2% of the 46 teachers at Wossman High School – a white school under
*de jure* segregation with a student body that is currently 99% black – were not
certified during the 2014-15 school year).

This school year, 31% of the District's white elementary school teachers and
administrators attend or work at Sallie Humble Elementary or Lexington

---

[3]        "Professionals" includes teachers, administrators, and all other certified staff.

Elementary, both of which were white schools under *de jure* segregation and together currently educate 90% of the District's white elementary school students.[4] The percentage of white elementary school teachers at Sallie Humble Elementary is more than 28 percentage points higher than the percentage of white elementary school teachers in the District overall, while the percentage of white elementary school teachers at Lexington Elementary is approximately 23 percentage points higher than the percentage of white elementary school teachers in the District overall. Likewise, 72% of the District's white middle school teachers and administrators work at Robert E. Lee Junior High School, which was a white school under *de jure* segregation and currently educates 96% of the District's white junior high school students.

Also, all 12 elementary school Gifted and Talented teachers are white. Six of the seven middle school gifted and talented teachers are white. In addition, 12 of the 13 high school gifted and talented teachers are white. There is only one black gifted and talented teacher. He teaches Talented Art at the historically and currently black junior high school – Carroll Junior High School – and at the historically and currently black high school – Carroll High School. Although several

---

[4]      Indeed, 56% of the District's white elementary school teachers and administrators work at just four of the District's 12 elementary schools – Sallie Humble, Lexington, Cypress Point University, and J.S. Clark Magnet, which together educate 98% of the District's white elementary students. Each of these schools has a proportion of white teachers and administrators that is 20 percentage points or more higher than the proportion of white elementary teachers and administrators District-wide. J.S. Clark Elementary was a black school under *de jure* segregation that became a magnet school as a result of an August 12, 1988 order in this case that required J.S. Clark – which was an all-black school at that time – to desegregate by offering enhanced educational programs to attract non-black students. Cypress Point University Elementary, which opened in 1997 and is located near the University of Louisiana at Monroe ("ULM") campus, is a ULM "Professional Development School" that has partnered with ULM's College of Education and Human Development to enable about 120 ULM teacher-candidates to teach Cypress Point students and some ULM faculty to hold their college classes on topics like Early Literacy at Cypress Point.

of the elementary school gifted and talented teachers split their time between schools, the black gifted and talented teacher is one of just three gifted and talented teachers who split their time between a junior high school and high school.  Both he and the other secondary gifted and talented teachers who split their time between schools split their time between schools that are virtually all black (indeed, both of the gifted and talented teachers at Carroll High also teach gifted and talented courses at Carroll Junior High).

Lastly, every school with a disproportionately high share of white faculty and students has a white principal, while the other schools – with the exception of the Sherrouse School (a white school under *de jure* segregation which appears to currently be an alternative K-12 school for students with disciplinary problems) – have black principals.  As noted earlier, four of the schools that currently have a disproportionately high share of white faculty and students – Neville, Lee, Sallie Humble, and Lexington – were white schools under *de jure* segregation.   The other two schools that have a disproportionately high share of white faculty and students are J.S. Clark Magnet Elementary and Cypress Point University Elementary.  J.S. Clark Magnet Elementary was a black school under *de jure* segregation that has since attracted some non-black students and faculty by implementing a magnet program.  Cypress Point University Elementary opened in 1997 and has attracted some non-black students and faculty via an affiliation with ULM.  In addition, with one exception, the assistant principals and other administrators in the schools with

a disproportionately high share of white faculty and students are white, while the

assistant principals and other administrators in the other schools are black.

**B.    Course Offerings and Academic Placement**

Inconsistent with this Court's March 30, 2010 Consent Decree directing the

District to "offer the same courses at every high school in the District," ECF No. 16

at 4, Neville High School offers 32 more courses than 99% black Carroll High

School.  Neville High School also offers far more college preparatory courses than

Carroll and 99% black Wossman High School.  For example, Neville offers Calculus,

French I-IV, Latin I-IV, Spanish III and IV (offered through the University of

Louisiana at Monroe), Theater Appreciation (offered through the Louisiana Delta

Community College), a gifted and talented Biology course, and AP Chemistry II,

while Carroll and Wossman do not.  *Compare* ECF No. 88-7 at 3-4 & 26-27 *with*

ECF No. 88-6 at 3 & 21 (the District provided information about Carroll's course

offerings to the United States via a response to the United States' information

request).  Similarly, across all schools in the District (elementary, middle, and

high), the schools that are racially identifiable as white have far more gifted and

talented course offerings than the other schools.[5]

On March 30, 2010, the Court also ordered the District to "work with the

Equity Assistance Center for the Intercultural Development Research Association

(IDRA) in order to ensure that all students have an equitable opportunity to

participate in Gifted, Honors, pre-AP, and AP programming at all schools in the

---

[5]    As Judge Stagg found in 1992, "Neville is the only high school offering most of the District's advanced placement courses."  Order, *Andrews v. City of Monroe Sch. Bd.*, No. 11297, at 4 (W.D. La. July 6, 1992) (Stagg, J.).

District." ECF No. 16 at 6.  However, the District has not worked with the IDRA since at least July 1, 2012, *see* ECF No. 88 at 1, ECF No. 76 at 1, and ECF No. 71 at 1, and the racial disparities that gave rise to that order persist.

During the 2014-15 school year, white students at Neville were significantly overrepresented in college preparatory courses. For example, 57% of Neville's 42 advanced, honors, advanced placement, or community college classes offered in academic subjects (i.e. excluding band and chorus) had white student enrollments that were at least 20 percentage points higher than the white student proportion of the overall school population. *See* ECF No. 88-2.  Moreover, even though white students only made up about a third of Neville's overall population, they made up nearly two-thirds of the students taking community college classes.  For example, Mr. Butler's Honors Latin III class was 100% white, while Mr. Hanks' AP Chemistry II class was 89% white, Ms. Sandifer's AP English IV class was 75% white, and Mr. Rogers' AP Pre-Calculus class was 83% white.  *See* ECF No. 88-2.

During the 2014-15 school year, white high school students were more than seven times as likely as black high school students to take an advanced placement exam (57% (192) of the District's 335 white high schoolers (all of whom were students at Neville) took AP exams, but only 8% (137) of the District's 1,637 black high schoolers took AP exams).

Finally, this school year, only 5.5% of the District's 7,306 black students are enrolled in gifted and talented courses, while 30.2% of the District's 1,011 white students are enrolled in gifted and talented courses.  Thus, white students are 5.5

9

times as likely as black students to be enrolled in gifted and talented courses.[6] These patterns are borne out at the school level.  For example, in 2015-16, Carroll Junior High has only six students enrolled in the gifted program (exclusive of talented art), while Lee Junior High has 74.  Similarly, in 2015-16, 99% black Carroll High School has eight students enrolled in gifted courses (exclusive of talented art), while Neville High School enrolls 183 students in gifted courses.

## IV.   Legal Standard

The goal of a school desegregation case is to convert a *de jure* segregated school system to a system without "white" schools or "black" schools, but just schools.  *Green v. County Sch. Bd. of New Kent*, 391 U.S. 430, 442 (1968).  The standard established by the Supreme Court for determining whether a school district has achieved unitary status, thus warranting termination of judicial supervision, is:  (1) **whether the school district has fully and satisfactorily complied with the court's decrees for a reasonable period of time**; (2) whether the vestiges of the prior de jure segregation have been eliminated to the extent practicable; and (3) **whether the school district has demonstrated a good-faith commitment to the whole of the court's decrees** and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.  *See Missouri v. Jenkins*, 515 U.S. 70, 87-89 (1995); *Freeman*, 503 U.S. at 491-92, 498; *Bd. of Educ. v. Dowell*, 498 U.S. 237, 248-50 (1991).  The school district has the burden of proving compliance with the desegregation order and demonstrating that the effects of state-imposed segregation have been remedied to the extent practicable.

---

[6]     30.2 divided by 5.5 is 5.49.

*Freeman*, 503 U.S. at 494. In addition to the "*Green* factors," courts may consider other indicia, such as "the quality of education being offered to the white and black student populations," *Freeman*, 503 U.S. at 473, and discipline, *see, e.g.*, *Tasby v. Estes*, 643 F.2d 1103 (5th Cir. 1981).

If, in fact, the District still has not achieved complete unitary status, "six decades after *Brown v. Topeka Board of Education*, '[t]he burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now.'" *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 240 (5th Cir. 2014). "The duty is not simply to eliminate express racial segregation: where de jure segregation existed, the school district's duty is to eliminate its effects "root and branch.""" *Id.* (citing *Green*, 391 U.S. at 437-38). This duty exists "to ensure that the principal wrong of the de jure system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present." *Freeman*, 503 U.S. at 485. Indeed, a "[f]ailure on the part of school authorities to implement a constitutionally prescribed unitary school system brings into play the full panoply of the trial court's remedial power." *Id.* (citing *Valley v. Rapides Parish Sch. Bd.*, 702 F.2d 1221, 1225 (5th Cir. 1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, (1971))).

## V.   Monitoring and Oversight

### A.   Appointment of an Independent Court Monitor

1.   Within 30 days of the parties' execution of this Agreement, the parties shall jointly select an Independent Court Monitor to monitor the implementation of

11

this Consent Decree.  The parties shall inform the Court of the appointee.  If the parties cannot agree on the selection of the Independent Court Monitor, they shall each submit the names of up to three candidates to the Court and the Court shall select from the names submitted.

**B.**     **The District's Responsibility to Assist the Independent Court Monitor**

1.     The Independent Court Monitor shall be given full access to the District's facilities, documents, staff, records/files, and consultants.

2.     The District will work with the Independent Court Monitor in good faith to ensure that the Independent Court Monitor has the appropriate information and personnel s/he needs to ensure the timely completion of the reports discussed in Sections VI.C.2, VI.D.2, and VII.

**C.**     **Fees and Costs of the Independent Court Monitor**

1.     The District shall pay the fees and costs, as contracted, of the Independent Court Monitor.

2.     The Independent Court Monitor shall provide the parties a draft of a proposed budget at least 30 days after appointment.  The parties shall raise with the Independent Court Monitor any objections they may have to the draft of the proposed budget within seven business days of its receipt.  If the objection is not resolved seven business days thereafter, either party may file the objection with the Court.  The Court shall consider such objections and make any adjustments it deems appropriate.

3.      Thereafter, the Independent Court Monitor shall submit annually a proposed budget to the parties in accordance with the process set forth in Section V.C.2 above.

4.      As appropriate, the Independent Court Monitor may submit a draft revision to the proposed budget, along with an explanation of the reason for the proposed revision, following the procedures set forth in Section V.C.2 above.

5.      Each line item of the Independent Court Monitor's invoices shall include a description of the nature and substance of the work performed (including a reference to the particular section of the Consent Decree involved) and the time spent on the work.  Accordingly, time entries for telephone calls, conferences, letters, and electronic correspondence shall state the purpose and nature of the communication and the persons involved.

**D.      Termination or Resignation of the Independent Court Monitor**

1.      S/he shall be terminated and replaced only with the parties' unanimous consent and the Court's approval.

2.      In the event the Independent Court Monitor resigns or the parties agree to replace the Independent Court Monitor, the parties will select a replacement within 30 days of the termination.  If the parties are unable to agree on a replacement, the parties shall follow the appointment process described in Section V.A.1 above.

**VI.      Remedial Measures**

**A.      Teacher and Principal Assignments**

13

1.    **Requirements**

     i.      The District will maintain policies and practices that assign classroom teachers so that in no case will the racial composition of a staff indicate that a school is intended for black students or white students. Accordingly, the District shall assign the staff described above so that the ratio of black to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.  For purposes of this Consent Decree, the District shall strive to ensure that the percentage of white teachers and the percentage of black teachers within each school does not deviate by more than 15 percentage points from the District-wide percentage of white teachers and the District-wide percentage of black teachers for the grade levels served by that school (e.g. the percentage of white teachers within a given elementary school should not deviate by more than 15 percentage points from the District-wide percentage of white elementary school teachers).

     ii.     Principals, assistant principals, and other administrators shall be assigned so that in no case shall the race of the principal, assistant principal, or other administrators indicate that a school is intended for black students or white students.

     (1)     Accordingly, the District shall assign principals so that the percentage of white principals and the percentage of black principals at schools with a disproportionately high proportion of white students – currently,

Neville High School, Lee Junior High, Sallie Humble Elementary, Lexington Elementary, J.S. Clark Magnet Elementary, and Cypress Point University Elementary – when those schools are considered as a group is substantially the same as the percentage of white principals and the percentage of black principals at the other schools when the other schools are considered as a comparison group.[7]

(2)     Similarly, the District shall assign assistant principals so that the percentage of white assistant principals and the percentage of black assistant principals at schools with a disproportionately high proportion of white students is substantially the same as the percentage of white assistant principals and the percentage of black assistant principals at the other schools.

(3)     In addition, the District shall assign other administrators so that the percentage of other administrators who are black and the percentage of other administrators who are white at schools with a

---

[7]     For example, since all six of the principals at the schools with a disproportionately high share of the District's white students are currently white, 100% of the principals at those schools are white.  Since about 37% of the District's principals are currently white, while about 63% are currently black, if the percentage of white principals at the schools with a disproportionately high share of white students were substantially the same as the percentage of white principals overall, then only about two of the principals at the six schools with a disproportionately high share of white students would be white, while about four of the principals at those six schools would be black and about four of the principals at the other schools would be white, while about nine of the principals at the other schools would be black.  Were this the case, the District would be in compliance with this provision of the Consent Decree because, in the aggregate, 37% of the principals at the schools that have a disproportionately high share of the white students would be white and 37% of the principals at the other schools would be white, while 63% of the principals at the schools with a disproportionately high share of the white students would be black and 63% of the principals at the other schools would be black.

disproportionately high proportion of white students is substantially the same as the percentage of other administrators who are black and the percentage of other administrators who are white at the other schools.

        iii.      Schools with disproportionately low numbers of white students shall have faculties that are just as qualified as the faculties of schools with disproportionately high numbers of white students.

        (1)      Accordingly, the percentage of highly qualified teachers at any given school shall be substantially the same as the percentage of highly qualified teachers District-wide at that school level (e.g. elementary v. middle v. high school);

        (2)      The percentage of credentialed teachers at any given school shall be substantially the same as the percentage of credentialed teachers District-wide at schools that serve the same grades.

        (3)      The percentage of teachers with less than three years of experience at any given school shall be substantially the same as the percentage of credentialed teachers District-wide at schools that serve the same grades.

        (4)      At the secondary level, academic departments (e.g. science, mathematics, art, English, social studies) at each school shall be populated by faculty who have comparable qualifications to the faculties in the corresponding academic department in the other schools serving those grades (e.g. other middle schools or other high schools).

16

## 2.    Implementation

i.    By February 29, 2016, the District will have completed a review of the racial make-up and credentials of the faculty in its schools District-wide.

(1)    The District shall consider a number of factors when evaluating credentials, including professional degrees, certifications, subject matter expertise, years of experience, performance reviews, qualifications of gifted teachers, qualifications of advanced placement teachers, training, and other indicia of quality and effectiveness.

ii.    The District will promptly take appropriate measures to meet the requirements of Section VI.A.1 as soon as possible but no later than the beginning of the 2016-17 school year.

(1)    These measures may include: providing professional development to current teachers; providing mentors to teachers and/or pairing teachers; and interim measures, if necessary, to build up its faculty's credentials to the extent possible.

(a)    However, to the extent the requirements of Section VI.A.1 cannot be met with the measures in Section VI.A.2.ii.1 alone, the District shall implement Section VI.A.2.ii.2, which governs, *inter alia*, voluntary and mandatory personnel moves.

(2)    The District may bring itself into compliance with Section VI.A.1 by hiring new teachers and/or through procedures governing

17

assignment (which may include procedures for assigning teachers to multiple schools), provisions providing for the mandatory reassignment of classroom teachers, and/or incentive plans designed to persuade teachers to volunteer for reassignment as necessary, provided that any combination of those plans be fully implemented by the start of the 2016-17 school year.

(a)      Because moving teachers and/or principals – en masse – to different schools during the school year would be disruptive and harmful to the students, if implementation of Section VI.A.2.ii.2 is necessary, the earliest practicable date that Section VI.A.1 can be fully implemented is by the beginning of the next school year – the 2016-17 school year.

(b)      Should the District opt to work towards compliance with the policies in Section VI.A.1 via the use of an incentive plan pursuant to Section VI.A.2.ii.2 that is designed to persuade teachers and/or principals to voluntarily transfer schools, the District shall develop a draft incentive plan and submit the plan to the United States for comment by February 1, 2016, the United States shall comment on the draft incentive plan by March 1, 2016, the District shall make all necessary revisions and finalize the plan by April 1, 2016, the District shall also inform teachers and/or principals of the incentive plan by April 1, 2016, and require statements of intent from teachers who will voluntarily transfer by May 1, 2016.

iii.      Should implementation of Section VI.A.2.ii.2 (other than the portion addressing an incentive plan) become necessary, then the District shall

18

present the United States with a plan for effecting Section VI.A.2.ii.2 by May 15, 2016.  Along with the plan, the District shall produce to the United States information disclosing, for each teacher and administrator in the District, the individual's race, whether the individual is credentialed, whether the individual has less than three years of teaching experience or experience as an administrator, whether the individual has been deemed highly qualified, and the individual's last performance rating (e.g. Highly Effective, Effective: Proficient, Effective: Emerging, Ineffective).

> iv.      By June 1, 2016, the District shall assign teachers and/or administrators as needed under Section VI.A.2.ii.2 to comply with Section VI.A.1.

### 3.      Records Maintenance

> i.      Beginning with the 2015-16 school year and continuing until the District's obligations pursuant to this section have concluded, the District will maintain the following records, for not less than two years:

> > (1)      Documentation of all plans made pursuant to Section VI.A.2.ii.2.

> ii.      Upon reasonable notice to the District, the United States will have the right to review the records kept pursuant to Section VI.A.3.i.

## B.      Equitable Access to Course Offerings

> 1.      The District shall create and maintain a District-wide course catalog of all of its high school courses offered, including college, online, distance learning, and any other courses.  This course catalog shall be included in each high

school's student handbook or otherwise disseminated to every high school student. Furthermore, the District shall send hard copies of this catalog home with students and shall post the catalog prominently on the homepage of the District's website, the homepage of the school board's website, and the homepage of each high school's website.

          i.      With the exception of courses that are a part of Carroll High School's medical magnet program, all high schools shall offer the same courses, that is, the courses listed in the District-wide high school course catalog.

          ii.      The course catalog shall note, in 14-point boldface font on the title page,

> With the exception of courses that are a part of Carroll High School's medical magnet program, the District shall strive to have all courses listed in this course catalog taught at each high school.  However, if a course (other than a magnet program course) is ultimately not taught at a given school, students at that school who wish to take that course will be given the opportunity to take the course at another school in the District.  The District will provide free transportation to the course, at the student's request, and will adjust the student's schedule and the scheduling and location of the course, as necessary, to facilitate the student's attendance at the course.

          2.      The District shall have a District-wide course catalog of all of its middle school courses.  This course catalog shall be included in each middle school's student handbook or otherwise disseminated to every middle school student. Furthermore, the District shall send hard copies of this catalog home with students and shall post the catalog prominently on the homepage of the District's website, the homepage of the school board's website, and the homepage of each middle school's website.

20

        i.        All middle schools shall offer the same courses, that is, the courses listed in the District-wide middle school course catalog.

        ii.        The course catalog shall note, in 14-point boldface font on the title page,

> The District shall strive to have all courses listed in this course catalog taught at each middle school.  However, if a course (other than a magnet program course) is ultimately not taught at a given school, students at that school who wish to take that course will be given the opportunity to take the course at another school in the District.  The District will provide free transportation to the course, at the student's request, and will adjust the student's schedule and the scheduling and location of the course, as necessary, to facilitate the student's attendance at the course.

        3.        The District shall have a District-wide course catalog for all gifted and talented courses offered to elementary school students.  The District shall make this catalog accessible to parents/guardians of all elementary school students by sending hard copies of the catalog home with students and posting the catalog prominently on the homepage of the District's website, the homepage of the school board's website, and the homepage of each elementary school's website.

        i.        With the exception of classes offered as a part of the magnet program at J.S. Clark Magnet Elementary, each elementary school shall offer the same gifted and talented courses, that is, the courses listed in the District-wide elementary school gifted and talented course catalog.

        ii.        The course catalog shall note, in 14-point boldface font on the title page,

> With the exception of courses that are a part of the J.S. Clark Magnet Elementary School's magnet program, the District shall strive to have

all courses listed in this course catalog taught at each elementary
school.  However, if a course (other than a magnet program course) is
ultimately not taught at a given school, students at that school who
wish to take that course will be given the opportunity to take the
course at another school in the District.  The District will provide free
transportation to the course, at the student's request, and will adjust
the student's schedule and the scheduling and location of the course, as
necessary, to facilitate the student's attendance at the course.

4.      If a course (other than a magnet program course) is ultimately
not taught at a given school, students at that school who wish to take that course
shall be given the opportunity to take the class at another school in the District.

i.      The District shall provide transportation to a student
taking a class at another District school under Section VI.B.4 if the student
requests such transportation.

ii.      The District shall work with the student and school
counselors to propose a schedule that meets the student's needs and will review the
scheduling and location of requested courses to improve accessibility and to reduce
the burden for interested students.

5.      Within 30 days of entry of this Consent Decree, the District shall
request the IDRA's assistance in building the District's capacity to effectively offer
equal access to the District's course offerings and advise students and/or parents
regarding course selection, including informing those students and/or parents about
the nature and benefits of various course offerings (and any course prerequisites) as
well as any application procedures for admission to gifted and talented or magnet
courses.

6.      Within 60 days of entry of this Consent Decree, the District shall enter into a contract for the IDRA's assistance.

7.      The District shall provide training to appropriate personnel on offering equal access to the District's course offerings and advising students and/or parents regarding course selection.

i.      The training shall be taught by administrators who have attended training conducted by the IDRA and/or IDRA personnel.

(1)      The District shall invite the IDRA to observe each administrator train their first group of school personnel – preferably in person, but by videoconference or video recording if necessary – so that the IDRA will have the opportunity to assist that administrator in delivering the training as planned.

ii.      All teachers and administrators must complete 4 hours of training on these topics per school year.

8.      The District shall arrange for conference calls with the IDRA and United States to update them as to the District's progress.

i.      These conference calls shall take place between seven to 21 days after each report is submitted as required by Section VII below.

C.      **Equitable Access to Specialized Academic Programs**

1.      **Requirements**

i.      Within 60 days of the entry of this Consent Decree, the District shall contract with the IDRA to: (a) conduct a comprehensive review of the District's policies and procedures governing administration of and placement into

23

gifted/talented programs and/or advanced placement ("AP"), pre-AP, and other advanced course offerings (collectively "specialized academic programs"); and (b) recommend additions and/or modifications to those policies and procedures to ensure that:

(1)     the District actively publicizes and broadly disseminates information about the availability of all specialized academic programs and the identification/placement processes for such programs;

(2)     black students are not under-identified for enrollment in specialized academic programs and the criteria for participation do not pose barriers to the participation of black students;

(3)     appropriate steps are taken to remedy any under-identification of black students; and

(4)     all qualifying students enjoy equal access to specialized academic programs, regardless of the school they attend.

ii.     The comprehensive review shall assess, among other things:

(1)     past enrollment in specialized academic programs, including any racial disparities (whether school-specific or District-wide);

(2)     past AP exam participation, including any racial disparities (whether school-specific or District-wide);

(3)     the practices used by guidance counselors, faculty, and staff to identify and/or refer black students for placement in specialized

24

academic programs and any differences between those practices and the practices used to identify and/or refer other students;

(4)     parental/student awareness of specialized academic programs, including any prerequisites to referral, selection, and/or enrollment;

(5)     the availability (including number and type) of specialized academic programs at each school within the District and any barriers such availability poses to ensuring that District students enjoy equal access to specialized academic programs; and

(6)     all other actual, perceived, and potential barriers to increased student participation (particularly among black students) in specialized academic programs.

iii.     Within 30 days of entry of this Consent Decree, the District shall designate a central office administrator to work with the IDRA on the comprehensive review referenced in Section VI.C.1.i(a) above.

iv.     Recommendations generated by the IDRA pursuant to Section VI.C.1.i(b) above shall include, but not be limited to:

(1)     proposed procedures for monitoring student assignment to specialized academic programs, identifying racial disparities in such assignment, and creating targeted responses to those racial disparities.

(2)     proposed mandatory annual trainings for all guidance counselors, faculty, and staff on the proper method(s) of identifying/referring students for placement in specialized academic programs.  The

25

trainings shall address implicit bias and racial and cultural sensitivity, and shall identify best practices for encouraging minority students to enroll in rigorous academic classes and programs, including those offered as part of the District's specialized academic programs.

(3)     proposed changes to the number and allocation of courses (by school) that comprise the District's specialized academic programs to ensure that all qualifying students enjoy equal access to such programs, regardless of the school they attend.

(4)     proposed changes to student handbooks and other written materials distributed to students and/or parents regarding the District's educational programs and activities that ensure students and their parents/guardians receive consistent information about specialized academic programs regardless of the school to which the student is assigned.

v.     By March 1, 2016, the District shall develop and implement a formal plan (the "Plan") for: publicizing the availability of specialized academic programs; ensuring that Black students are not under-identified for participation in such programs and rectifying any existing under-identification; training guidance counselors, faculty, and staff on the proper method(s) of identifying students for placement in specialized academic programs; and making such programs equally accessible to all qualifying students regardless of the school they attend.  The Plan shall include the recommendations formulated pursuant to

Section VI.C.1.i(b) above, unless the District first provides the United States with written justification why any such recommendation should be excluded.

### 2.    Reporting

vi.    By February 1, 2016, the Independent Court Monitor shall provide the United States with a written status update regarding the assessment of specialized academic programs conducted pursuant to Section VI.C.1.i(a) above, including but not limited to documentation reflecting the frequency and extent of the District's consultation with the IDRA on matters related to the assessment, and any preliminary findings and/or recommendations.

vii.    By March 1, 2016, the Independent Court Monitor shall provide the United States a copy of the Plan developed pursuant to Section VI.C.1.v above.

### D.    Medical Magnet Program

### 1.    Requirements

i.    By December 15, 2015, the District will employ a qualified expert to evaluate the District's existing medical magnet program and develop recommendations for making the magnet program more comprehensive and attractive to white students.  The expert shall abide by the requirements imposed on the Independent Court Monitor in Section V.C except that the expert is not required to reference the particular section of the consent decree involved in his/her descriptions of the work performed on his/her invoices.  The expert shall submit a written report outlining his or her findings and recommendations no later than

27

February 15, 2016.  The District shall implement all recommendations outlined in the report no later than April 1, 2016, unless it first provides the United States written justification why any such recommendations should not be implemented.

   ii.  In addition to implementing the recommendations referenced in Section VI.D.1.i above, no later than January 15, 2016 the District shall contact the University of Louisiana at Monroe and the Louisiana Delta Community College to negotiate the establishment of a mentoring program in which college and university students studying nursing or other healthcare professions mentor medical magnet students at Carroll High School.  During negotiations, the District shall also seek to establish transition assistance opportunities – including but not limited to – discounted tuition for students in the medical magnet program who enroll as students at University of Louisiana at Monroe or Louisiana Delta Community College.

   iii.  By January 15, 2016, the District shall also contact at least three local hospitals and/or medical centers to negotiate shadowing opportunities for students enrolled in the medical magnet program.

   iv.  By February 15, 2016, the District will ensure that the homepage of the website for each of its high schools prominently features information regarding the medical magnet program.  This information shall include, at a minimum, a description of the medical magnet program and specific guidance regarding the timeline and process for applying for admission to the program.

   **2.**  **Reporting**

v.      By January 31, 2016, the Independent Court Monitor shall provide the United States with documentation reflecting the District's communication with the University of Louisiana at Monroe and Louisiana Delta Community College, including but not limited to the date(s) of any such communication, the parties to the communication, and the outcome of the communication.  The documentation provided shall include copies of any letters, emails, or other written communication.

vi.      By January 31, 2016, the Independent Court Monitor shall provide the United States with documentation reflecting the District's communication with local hospitals and/or medical centers referenced in Section VI.D.1.iii above, including but not limited to the name of the hospital/medical center, the date(s) of the District's communication with that hospital/medical center, the parties to the communication, and the outcome of the communication. The documentation provided shall include copies of any letters, emails, or other written communication.

vii.      By February 15, 2016, the Independent Court Monitor shall provide the United States with a copy of the written expert report referenced in Section VI.D.1.i above.

## VII.   Reporting

In addition to the interim reports discussed in Sections VI.C.2 and VI.D.2 above, the Independent Court Monitor shall submit to the Court, and to counsel of record for all parties, quarterly reports pursuant to this Consent Decree until such

29

time as the District is declared unitary.  The Independent Court Monitor shall submit these reports each January 31st, March 31st, June 30th, and October 30th (or the first business day thereafter if those dates fall on a weekend or holiday), with the first report due the first business day after Sunday, January 31, 2016. Each report shall include a key for any codes or abbreviations used therein.

### A.    Requirements for All Reports

All reports shall include the following information for the time period since the last report was submitted (except that the January 31, 2016 report shall include the requested information since the start of the 2015-16 school year):

1.    A list of all trainings, if any, provided to faculty/staff related to course selection advising or placement in specialized academic programs, including the title/topic of the training, the training date and duration, the training location, the number of teachers who attended, the number of administrators who attended and their titles, the number of staff who attended and their titles, the training provider/instructor, a brief description of the training, a copy of any PowerPoint or other presentation delivered at the training, copies of any handouts provided, and a list of any books used (e.g. for a book study);

2.    A complete description of the specific efforts, if any, the District has taken to encourage students – particularly Black students – to enroll in specialized academic programs (including the gifted and talented program, high school Honors, pre-AP, AP, and college classes), including efforts to inform students and parents about the nature and benefits of those courses, as well as application or selection

processes, admissions criteria, course prerequisites, aptitude tests and scores, and applicable deadlines.  To the extent that these efforts involved the dissemination or posting of written notices, the District shall provide copies of such notices;

3. A report of all consultation the District has had with the IDRA to address racial disparities in course enrollment and/or participation in specialized academic programs, including the date of the consultation and a detailed description of the nature of the consultation; and

4. A report of all consultation the District has had with community groups to address racial disparities in course enrollment.

**B. Additional Requirements for the January 31 and June 30 Reports**

The January 31st and June 30th reports shall also include the following for the previous academic semester (i.e. the January 31 report shall include information about the Fall semester, while the June 30 report shall include information for the Spring semester):

1. The District-wide course catalog for the District's high schools;

2. The District-wide course catalog for the District's middle schools;

3. The District-wide course catalog for gifted and talented courses offered at the District's elementary schools;

4.     A complete list[8] of all courses, by school, actually taught at each of the District's middle and high schools, including information specifying which courses are gifted and talented, AP, or dual enrollment courses, and which were taught online or via another distance learning arrangement;

5.     For each classroom in each middle school and high school, for each class period, the number of students by race and grade level, indicating the name and race of the faculty member(s) assigned to the classroom, the subject of the class, whether the class is an elective or a non-elective course, and whether any students in the class are grouped or assigned by race, ability, achievement, language needs, or another basis;

6.     For each gifted and talented classroom and program in each elementary school, for each class period, the number of students by race and grade, indicating the name and race of the faculty member(s) assigned to the classroom, the course title, and whether any students in the class are grouped or assigned by race, ability, achievement, language needs, or another basis;

7.     A copy or narrative description of all faculty and staff assignment policies or procedures in effect;

8.     For each work site (*i.e.*, school, building, central office), a roster of employees disclosing each employee's name, race, gender, title, teaching credential(s) (if any), highest degree obtained, years of teaching experience (for

---

[8]     Where this Consent Decree directs the production of a list, the District shall assist the Independent Court Monitor by producing an actual list to the Independent Court Monitor – not documentary evidence from which a knowledgeable reader might be able to discern enough information to compile a list – but an actual list.  The District, not the Court or the Plaintiff Parties, is in the best position to ascertain the information that should be listed.

teachers), years of experience as a school administrator (for administrators), whether the individual is highly qualified, and the last performance rating received (e.g. Highly Effective, Effective: Proficient, Effective: Emerging, or Ineffective);

9.      The number of students by race and grade level enrolled in the medical magnet program at Carroll High School;

10.     The number of students at the University of Louisiana at Monroe, the Louisiana Delta Community College, or any other college or university, by race, serving as mentors to medical magnet program students, as well as the number of medical magnet students, by race, being mentored; and

11.     The number of medical magnet program students provided shadowing opportunities and for each student provided such an opportunity, the student's name, his or her race, and the date(s), location(s), and nature of the shadowing opportunity.

## VIII.   Termination of Judicial Supervision

Assuming this Consent Decree is properly implemented and the District otherwise complies with applicable federal law, the Parties anticipate that the District will be in a position to be declared unitary by September 30, 2017. Nevertheless, until the District achieves unitary status, the Court will continue to have supervision of this case to ensure that the District undertakes in good faith its obligations under this Consent Decree and federal law.  The District may move for a declaration of complete unitary status no sooner than 45 days after the Plaintiff Parties receive the July 15, 2017 report.  Prior to the District filing a motion for

partial or total unitary status, the Parties will confer to determine whether they agree that the District has demonstrated that it has implemented in good faith a section or sections of this Consent Decree.  In the absence of a pending motion by the Plaintiff Parties for further relief, or a ruling by this Court as to the District's noncompliance with this Consent Decree or federal law, the Plaintiff Parties agree that they will not object to a motion for unitary status.

## IX.   Effect of Prior Orders

B.      This Consent Decree amends the March 30, 2010 Consent Decree and all subsequent orders in this matter to include the terms outlined herein.  At a minimum, this Consent Decree shall remain in force until the conclusion of the 2016-17 school year.

C.      All prior orders not inconsistent herewith remain in full force and effect.

HEREBY ORDERED, ADJUDGED, AND DECREED, this the  11th day of  December , 2015.

_____
The Honorable Robert G. James
United States District Judge for the
Western District of Louisiana


APPROVED REGARDING FORM AND CONTENT:

*For Plaintiff-Intervenor United States of America:*

VANITA GUPTA
Principal Deputy Assistant Attorney
General

34

/s/ Michaele N. Turnage Young
/s/ Kelly D. Gardner
ANURIMA BHARGAVA
FRANZ MARSHALL
MICHAELE N. TURNAGE YOUNG
(CA Bar# 247796)
KELLY D. GARDNER
(NY Bar# 4494142)
Educational Opportunities Section
U.S. Dept. of Justice, Civil Rights Div.
950 Pennsylvania Ave., NW, PHB 4300
Washington, D.C. 20530
Tel: (202) 305-4282

STEPHANIE A. FINLEY
United States Attorney

/s/ Katherine W. Vincent
KATHERINE W. VINCENT (LA #18717)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, LA 70501-6832
Tel: (337) 262-6618

*For Defendant Monroe City School Board:*

/s/ L. Douglas Lawrence
L. DOUGLAS LAWRENCE (LA #18636)
The Lawrence Law Firm, LLC
1900 North 18th Street, Suite 207
Monroe, Louisiana 71201

## X.    APPENDIX A

| Monroe City School District Student Racial Demographics as of Sept. 2015[9] (not including pre-kindergardeners ("PK")) | | | | |
|---|---|---|---|---|
| School | White | Black | Other | Total |
| Barkdull Faulk Elementary (PK-6) | 2 (0.7%) | 294 (99.3%) | 0 (0%) | 296 |
| Berg Jones Elementary (PK-5) | 3 (0.6%) | 484 (99.4%) | 0 (0%) | 487 |
| Carver Elementary (PK-6) | 0 (0%) | 373 (100%) | 0 (0%) | 373 |
| Clara Hall Accelerated (PK-2) | 1 (0.3%) | 310 (99.4%) | 1 (0.3%) | 312 |
| Cypress Point Elementary (PK-5) | 28 (7.0%) | 358 (89.5%) | 14 (3.5%) | 400 |
| J.S. Clark Magnet Elementary (PK-6) | 16 (3.5%) | 441 (95.5%) | 5 (1.1%) | 462 |
| Lexington Elementary (PK-6) | 249 (44.9%) | 268 (48.3%) | 38 (6.8%) | 555 |
| Lincoln Elementary (PK-6) | 3 (0.8%) | 359 (98.9%) | 1 (0.3%) | 363 |
| Madison James Foster Elementary (PK-6) | 2 (0.5%) | 428 (99.5%) | 0 (0%) | 430 |
| Minnie Ruffin Elementary (PK-5) | 0 (0%) | 578 (99.1%) | 5 (0.9%) | 583 |
| Sallie Humble Elementary (PK-6) | 231 (41.6%) | 296 (53.3%) | 28 (5.0%) | 555 |
| Thomas Jefferson Upper Elementary (3-5) | 0 (0%) | 275 (99.6%) | 1 (0.4%) | 276 |
| *Elementary School Totals* | *535 (10.5%)* | *4,464 (87.7%)* | *93 (1.8%)* | *5,092* |
| | | | | |
| Carroll Junior High (7-8) | 3 (1.0%) | 298 (98.7%) | 1 (0.3%) | 302 |
| Martin Luther King, Jr. Middle (6-8) | 1 (0.4%) | 261 (98.9%) | 2 (0.8%) | 264 |
| Robert E. Lee Junior High (7-8) | 110 (28.5%) | 261 (67.6%) | 15 (3.9%) | 386 |
| *Middle School Totals* | *114 (12.0%)* | *820 (86.1%)* | *18 (1.9%)* | *952* |
| | | | | |
| Carroll High (9-12) | 1 (0.2%) | 532 (99.6%) | 1 (0.2%) | 534 |
| Neville High (9-12) | 348 (34.2%) | 618 (60.8%) | 51 (5.0%) | 1017 |
| Wossman High (9-12) | 6 (0.9%) | 627 (98.7%) | 2 (0.3%) | 635 |

---

[9]    The District's counsel provided student enrollment data on Sept. 11, 2015.  He noted that this information does not include pre-kindergarten numbers.

| Monroe City School District<br>Student Racial Demographics as of Sept. 2015[9]<br>(not including pre-kindergardeners ("PK")) | | | | |
|---|---|---|---|---|
| School | White | Black | Other | Total |
| *High School Totals* | *355 (16.2%)* | *1,777 (81.3%)* | *54 (2.5%)* | *2,186* |
| | | | | |
| Sherrouse School (K-12) | 0 (0%) | 12 (100%) | 0 (0%) | 12 |
| MCSB Virtual School (8-12) | 5 (22.7%) | 17 (77.3%) | 0 (0%) | 22 |
| *Other School Totals* | *5 (14.7%)* | *29 (85.3%)* | *0 (0%)* | *34* |
| | | | | |
| TOTAL: | *1,011 (11.9%)* | *7,306 (86.1%)* | *165(1.9%)* | *8,482* |

| Monroe City School District<br>Student Racial Demographics as of Oct. 2014[10] | | | | |
|---|---|---|---|---|
| School | White | Black | Other | Total |
| Barkdull Faulk Elementary (PK-6) | 1 (0.4%) | 268 (99%) | 1 (0.4%) | 270 |
| Berg Jones Elementary (PK-5) | 2 (0.4%) | 446 (99%) | 2 (0.4%) | 450 |
| Carver Elementary (PK-6) | 0 (0%) | 378 (99%) | 4 (1%) | 382 |
| Clara Hall Accelerated (PK-2) | 4 (1%) | 318 (99%) | 0 (0%) | 322 |
| Cypress Point Elementary (PK-5) | 38 (9%) | 368 (89%) | 8 (2%) | 414 |
| J.S. Clark Magnet Elementary (PK-6) | 15 (3%) | 456 (96%) | 5 (1%) | 476 |
| Lexington Elementary (PK-6) | 265 (46%) | 277 (49%) | 29 (5%) | 571 |
| Lincoln Elementary (PK-6) | 1 (0.3%) | 395 (99.7%) | 0 (0%) | 396 |
| Madison James Foster Elementary (PK-6) | 0 (0%) | 444 (100%) | 0 (0%) | 444 |
| Minnie Ruffin Elementary (PK-5) | 1 (0.2%) | 569 (98%) | 9 (2%) | 579 |
| Sallie Humble Elementary (PK-6) | 206 (40%) | 296 (57%) | 19 (4%) | 521 |
| Thomas Jefferson Upper Elementary (3-5) | 0 (0%) | 265 (99%) | 2 (1%) | 267 |
| *Elementary School Totals* | *533 (10%)* | *4480 (88%)* | *79 (2%)* | *5092* |
| | | | | |
| Carroll Junior High (7-8) | 1 (0.3%) | 296 (99%) | 2 (1%) | 299 |
| Martin Luther King, Jr. Middle (6-8) | 0 (0%) | 262 (99.6%) | 1 (0.4%) | 263 |
| Robert E. Lee Junior High (7-8) | 103 (25%) | 302 (72%) | 12 (3%) | 417 |
| *Middle School Totals* | *104 (10.6%)* | *860(87.8%)* | *15(1.5%)* | *979* |
| | | | | |

---

[10]     The District's 2014 Status Report, ECF No. 81-1.

| Monroe City School District Student Racial Demographics as of Oct. 2014[10] | | | | |
|---|---|---|---|---|
| School | White | Black | Other | Total |
| Carroll High (9-12) | 1 (0.2%) | 480 (99.6%) | 1 (0.2%) | 482 |
| Neville High (9-12) | 330 (34%) | 596 (61%) | 46 (5%) | 972 |
| Wossman High (9-12) | 4 (0.7%) | 561 (99.1%) | 1 (0.2%) | 566 |
| *High School Totals* | *335 (17%)* | *1,637 (81%)* | *48 (2%)* | *2020* |
| | | | | |
| Sherrouse School (K-12) | 2 (18%) | 9 (82%) | 0 (0%) | 11 |
| MCSB Virtual School (8-12) | 7 (17%) | 34 (81%) | 1 (2%) | 42 |
| *Other School Totals* | *9 (17%)* | *43 (81%)* | *1 (2%)* | *53* |
| | | | | |
| TOTAL: | *982 (12%)* | *7,255 (87%)* | *145 (2%)* | *8,382* |

| Monroe City School District Teacher Racial Demographics as of Oct. 2014[11] | | | | |
|---|---|---|---|---|
| School | White | Black | Other | Total |
| Barkdull Faulk Elementary (PK-6) | 5 (33%) | 10 (67%) | 0 (0 %) | 15 |
| Berg Jones Elementary (PK-5) | 13 (48%) | 13 (48%) | 1 (4%) | 27 |
| Carver Elementary (PK-6) | 10 (42%) | 14 (58%) | 0 (0%) | 24 |
| Clara Hall Accelerated (PK-2) | 4 (24%) | 13 (76%) | 0 (0%) | 17 |
| Cypress Point Elementary (PK-5) | 20 (83%) | 4 (17%) | 0 (0%) | 24 |
| J.S. Clark Magnet Elementary (PK-6) | 19 (76%) | 6 (24%) | 0 (0%) | 25 |
| Lexington Elementary (PK-6) | 23 (77%) | 7 (23%) | 0 (0%) | 30 |
| Lincoln Elementary (PK-6) | 6 (27%) | 16 (73%) | 0 (0%) | 22 |
| Madison James Foster Elementary (PK-6) | 8 (33%) | 14 (58%) | 2 (8%) | 24 |
| Minnie Ruffin Elementary (PK-5) | 7 (26%) | 20 (74%) | 0 (0%) | 27 |
| Sallie Humble Elementary (PK-6) | 17 (68%) | 8 (32%) | 0 (0%) | 25 |
| Thomas Jefferson Upper Elementary (3-5) | 1 (7%) | 13 (93%) | 0 (0%) | 14 |
| *Elementary School Totals* | *133 (49%)* | *138 (50%)* | *3 (1%)* | *274* |
| | | | | |
| Carroll Junior High (7-8) | 3 (19%) | 12 (75%) | 1 (6%) | 16 |
| Martin Luther King, Jr. Middle (6-8) | 7 (50%) | 7 (50%) | 0 (0%) | 14 |

11      The District's 2014 Status Report, ECF No. 81-2 to 81-21.

| Monroe City School District Teacher Racial Demographics as of Oct. 2014[11] | | | | |
|---|---|---|---|---|
| School | White | Black | Other | Total |
| Robert E. Lee Junior High (7-8) | 22 (81%) | 5 (19%) | 0 (0%) | 27 |
| *Middle School Totals* | *32 (56.1%)* | *24 (42.1%)* | *1 (1.8%)* | *57* |
| | | | | |
| Carroll High (9-12) | 7 (23%) | 20 (67%) | 3 (10%) | 30 |
| Neville High (9-12) | 39 (71%) | 11 (20%) | 5 (9%) | 55 |
| Wossman High (9-12) | 9 (27%) | 21 (64%) | 3 (9%) | 33 |
| *High School Totals* | *55 (47%)* | *52 (44%)* | *11 (9%)* | *118* |
| | | | | |
| Sherrouse School (K-12) | 4 (80%) | 0 (0%) | 1 (20%) | 5 |
| MCSB Virtual School (8-12) | No data | No data | No data | No data |
| *Other School Totals* | *--* | *--* | *--* | *--* |
| | | | | |
| TOTAL: | -- | -- | -- | -- |

| Monroe City School District Staff Racial Demographics as of Oct. 2014[12] | | | | |
|---|---|---|---|---|
| School | White | Black | Other/Unknown | Total |
| Barkdull Faulk Elementary (PK-6) | 4 (36%) | 2 (18%) | 5 (45%) | 11 |
| Berg Jones Elementary (PK-5) | 5 (26%) | 4 (21%) | 10 (53%) | 19 |
| Carver Elementary (PK-6) | 2 (9%) | 5 (22%) | 16 (70%) | 23 |
| Clara Hall Accelerated (PK-2) | 4 (20%) | 6 (30%) | 10 (50%) | 20 |
| Cypress Point Elementary (PK-5) | 7 (47%) | 5 (33%) | 3 (20%) | 15 |
| J.S. Clark Magnet Elementary (PK-6) | 13 (52%) | 2 (8%) | 10 (40%) | 25 |
| Lexington Elementary (PK-6) | 9 (41%) | 4 (18%) | 9 (41%) | 22 |
| Lincoln Elementary (PK-6) | 4 (19%) | 5 (42%) | 12 (57%) | 21 |
| Madison James Foster Elementary (PK-6) | 8 (31%) | 6 (23%) | 12 (46%) | 26 |
| Minnie Ruffin Elementary (PK-5) | 3 (11%) | 8 (30%) | 16 (59%) | 27 |
| Sallie Humble Elementary (PK-6) | 6 (24%) | 1 (6%) | 18 (72%) | 25 |
| Thomas Jefferson Upper Elementary (3-5) | 8 (31%) | 8 (31%) | 10 (38%) | 26 |
| *Elementary School Totals* | *73 (28%)* | *56 (22%)* | *131 (50%)* | *260* |
| | | | | |

---

[12]    The District's 2014 Status Report, ECF No. 81-2 to 81-21.

| Monroe City School District Staff Racial Demographics as of Oct. 2014[12] | | | | |
|---|---|---|---|---|
| School | White | Black | Other/Unknown | Total |
| Carroll Junior High (7-8) | 6 (20%) | 11 (37%) | 13 (43%) | 30 |
| Martin Luther King, Jr. Middle (6-8) | 7 (26%) | 11 (41%) | 9 (33%) | 27 |
| Robert E. Lee Junior High (7-8) | 7 (35%) | 4 (20%) | 9 (45%) | 20 |
| | | | | |
| *Middle School Totals* | *20 (26%)* | *26 (34%)* | *31 (40%)* | *77* |
| | | | | |
| Carroll High (9-12) | 3 (15%) | 10 (50%) | 7 (35%) | 20 |
| Neville High (9-12) | 14 (45%) | 4 (13%) | 13 (42%) | 31 |
| Wossman High (9-12) | 5 (17%) | 14 (47%) | 11 (37%) | 30 |
| *High School Totals* | *22 (27%)* | *28 (35%)* | *31 (32%)* | *81* |
| | | | | |
| Sherrouse School (K-12) | 1 (11%) | 2 (22%) | 6 (67%) | 9 |
| MCSB Virtual School (8-12) | No data | No data | No data | No data |
| *Other School Totals* | -- | -- | -- | -- |
| | | | | |
| TOTAL: | -- | -- | -- | -- |

| Monroe City School District Teacher Racial Demographics as of Sept. 2015[13] | | | | |
|---|---|---|---|---|
| School | White | Black | Other | Total |
| Barkdull Faulk Elementary (PK-6) | 8 (38.1%) | 13 (61.9%) | 0 (0%) | 21 |
| Berg Jones Elementary (PK-5) | 17 (48.6%) | 18 (51.4%) | 0 (0%) | 35 |
| Carver Elementary (PK-6) | 7 (26.9%) | 19 (73.1%) | 0 (0%) | 26 |
| Clara Hall Accelerated (PK-2) | 10 (37.0%) | 17 (63.0%) | 0 (0%) | 27 |
| Cypress Point Elementary (PK-5) | 23 (79.3%) | 5 (17.2%) | 1 (3.4%) | 29 |
| J.S. Clark Magnet Elementary (PK-6) | 29 (80.6%) | 7 (19.4%) | 0 (0%) | 36 |
| Lexington Elementary (PK-6) | 33 (75.0%) | 11 (25.0%) | 0 (0%) | 44 |
| Lincoln Elementary (PK-6) | 10 (35.7%) | 18 (64.3%) | 0 (0%) | 28 |
| Madison James Foster Elementary (PK-6) | 10 (29.4%) | 23 (67.6%) | 1 (2.9%) | 34 |
| Minnie Ruffin Elementary (PK-5) | 13 (33.3%) | 26 (66.7%) | 0 (0%) | 39 |
| Sallie Humble Elementary (PK-6) | 29 (80.6%) | 7 (19.4%) | 0 (0%) | 36 |
| Thomas Jefferson Upper Elementary (3-5) | 13 (40.6%) | 19 (59.4%) | 0 (0%) | 32 |

---

[13]     The District's Counsel provided this information to the United States on Sept. 11, 2015.

| Monroe City School District Teacher Racial Demographics as of Sept. 2015[13] | | | | |
|---|---|---|---|---|
| **School** | **White** | **Black** | **Other** | **Total** |
| *Elementary School Totals* | *202 (52.2%)* | *183 (47.3%)* | *2 (0.5%)* | *387* |
| | | | | |
| Carroll Junior High (7-8) | 6 (24%) | 18 (72%) | 1 (4%) | 25 |
| Martin Luther King, Jr. Middle (6-8) | 6 (22.2%) | 21 (77.8%) | 0 (0%) | 27 |
| Robert E. Lee Junior High (7-8) | 31 (81.6%) | 7 (18.4%) | 0 (0%) | 38 |
| *Middle School Totals* | *43 (47.8%)* | *46 (51.1%)* | *1 (1.1%)* | *90* |
| | | | | |
| Carroll High (9-12) | 10 (23.3%) | 31 (72.1%) | 2 (4.7%) | 43 |
| Neville High (9-12) | 55 (76.4%) | 17 (23.6%) | 0 (0%) | 72 |
| Wossman High (9-12) | 20 (39.2%) | 30 (58.8%) | 1 (2.0%) | 51 |
| *High School Totals* | *85 (51.2%)* | *78 (47.0%)* | *3 (1.8%)* | *166* |
| | | | | |
| Sherrouse School (K-12) | 9 (75.0%) | 2 (16.7%) | 1 (8.3%) | 12 |
| MCSB Virtual School (8-12) | No data | No data | No data | -- |
| *Other School Totals* | -- | -- | -- | -- |
| | | | | |
| TOTAL: | -- | -- | -- | -- |