UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **JIMMY ANDREWS, ET AL.** | **CIVIL ACTION NO. 65-11297** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **MONROE CITY SCHOOL BOARD, ET AL.** | |

**RULING**

Pending before the Court is Plaintiff United States of America's ("the United States") Motion for Order to Show Cause [Doc. No. 144].  The United States contends that Defendant Monroe City School Board ("the School Board") and Superintendent Brent Vidrine ("Dr. Vidrine") failed to meet deadlines and other requirements of the Consent Decree in effect and failed to take the required steps to desegregate the District's faculty.  The United States moves the Court to order the School Board and Dr. Vidrine to show cause why they should not be held in contempt.  If the School Board and Dr. Vidrine are found in contempt, the United States moves the Court to order them to pay a civil fine of $100 per day for each day of noncompliance, to pay a civil fine of double that amount for each calendar week of continued noncompliance, and to extend the deadline for the Carroll High School Medical Magnet Program ("Medical Magnet Program") applications for the 2016-17 school year to at least one month after the District has cured its related noncompliance.

In response, the School Board filed a memorandum in opposition [Doc. No. 152] and a "Motion for Relief under FRCvP 12(c) and (d)." [Doc. No. 181].  Dr. Vidrine filed a Motion for Judgment on the Pleadings [Doc. No. 170].

For the following reasons, the United States' Motion for Order to Show Cause is DENIED, and Dr. Vidrine's and the School Board's motions are DENIED AS MOOT.

I.      **Procedural History Leading up to the Filing of the Motion for Order to Show Cause**[1]

For more than 50 years, the School Board has operated the District under a desegregation decree. On August 5, 1965, a Complaint was filed in the name of then-minor students, Jimmy Andrews and Tommy Ray Robertson, by their mothers, against the City of Monroe ("the City"), the Mayor, the members of the School Board, and the Superintendent. On September 17, 1965, the Court issued a permanent injunction prohibiting Defendants from operating a bi-racial school system.

On August 1, 1969, the Court issued a desegregation decree. Over the years, the original desegregation decree has been modified numerous times.

On July 6, 1992, United States District Judge Tom Stagg granted the School Board's motion for unitary status in part and declared the District unitary in the areas of facilities, extracurricular activities, and hiring and retention of teachers and administrators. Judge Stagg denied the School Board's motion in part, finding that the District was not unitary in the areas of teacher and principal assignments, student assignments, and transportation.

On July 9, 1998, Benya Marshall ("Marshall") and Annie Faye Harris ("Harris") were permitted to join the case as individual Plaintiffs.

Between 1998 and 2008, there were limited proceedings in this case, mainly addressing certain zoning issues and the continued filing of status reports.

In 2008, the Court, on its own motion, began examining all remaining desegregation cases on its docket. In this case, the United States and the School Board began working together to

---

[1] The Court has previously detailed the complete procedural history. *See* [Doc. No. 106]. This Ruling focuses on the procedural history at issue.

reach a consent decree for the Court's approval.

As a result, the parties submitted a proposed consent decree, which the Court approved on March 30, 2010. [Doc. No. 16]. The March 30, 2010 Consent Decree was to be in effect for five school years, or until June 30, 2014, when the parties were to "conduct a full evaluation of the District's compliance with the terms of [the Consent Decree] and with the Fourteenth Amendment . . . . and applicable federal law to determine the District's eligibility to request a declaration of unitary status from this Court" in the remaining areas. *Id.* at p.7.

On June 18, 2012, the Court conducted a telephone status conference, at which time

> [t]he Court raised the issue of the pending March 30, 2010 Consent Decree. Under that Decree, a unitary status review is set to take place after June 30, 2014. However, it is the intent of the Court that the parties take affirmative steps to address any issues that would prevent a unitary status finding in 2014. As issues arise, the Court expects the parties to attempt to reach an amicable resolution or to contact the Court for a hearing to resolve the issues, rather than waiting to conduct a review in 2014. In the upcoming June 30, 2012 status report, the Court expects the School Board to identify and address any unresolved issues.

[Doc. No. 55].

On May 13, 2014, the Court issued a minute entry which stated as follows:

> . . . The parties have not contacted the Court about unresolved issues, nor have they requested a status conference on this topic. Accordingly, the Court anticipates that the parties will file a joint motion for unitary status on or after June 30, 2014. If the Department of Justice, the Monroe City School Board, or the individual Plaintiffs have any remaining concerns about issues related to the *Green* factors, they must file a motion for a status conference immediately.

[Doc. No. 75]. No motion was filed.

On July 22, 2014, the Court held a status conference with the parties and ordered the School Board to file a motion for unitary status or the parties to file a status report by August 18, 2014. However, in subsequent filings and status conferences, the School Board's counsel reported that the

School Board had not authorized him to file a motion for unitary status. During this time, the United States raised no concerns about the District's desegregation efforts on the remaining *Green* factor or the District's compliance with the March 30, 2010 Consent Decree.

On June 15, 2015, another status conference was held, and the Court informed the parties that it intended to conduct a *sua sponte* unitary status review. [Doc. No. 86]. The United States stated that it did not intend to take any further action. The following day, the Court set a unitary status hearing for September 21, 2015. [Doc. No. 87].

On September 8, 2015, at a pre-hearing conference, the United States raised concerns about the District's compliance with the March 30, 2010 Consent Decree for the first time since 2010. [Doc. No. 97].

On September 21, 2015, the unitary status hearing was held as scheduled, and the Court took evidence and heard the parties' arguments. At the conclusion, the Court declared the District unitary in the areas of transportation and student assignments. The Court found that the District had not achieved unitary status in the area of "principal and teacher assignments and has not fully complied with the March 30, 2010 Consent Order." [Doc. No. 107].

Following the hearing, the parties were able to reach an agreement to amend the March 30, 2010 Consent Decree. The new Consent Decree was approved by the Court on December 11, 2015. [Doc. No. 113].[2] Sections V, VI, and VII of the 44-page document provide the substantive actions the School Board agreed to take with regard to monitoring and oversight through the use of an independent court monitor ("ICM"), teacher and principal assignments, equitable access to course

---

[2] The December 11, 2015 Consent Decree provides that "[a]ll prior orders not inconsistent herewith remain in full force and effect." [Doc. No. 113, p. 34].

offerings, equitable access to specialized academic programs, and the Medical Magnet Program. "At a minimum, th[e] Consent Decree [was to] remain in force until the conclusion of the 2016-17 school year," but the parties "anticipate[d] that the District will be in a position to be declared unitary by September 30, 2017."[3] *Id.* at pp. 33-34.

On January 12, 2016, by minute entry and at the request of the parties, the Consent Decree was amended to extend the deadline for notifying the Court of the selection of the ICM to January 22, 2016.

Two months later, the parties sought another amendment to the December 11, 2015 Consent Decree, which was approved by the Court on March 24, 2016. [Doc. No. 133]. The amendment extended and re-set a number of the deadlines in the December 11, 2015 Consent Decree, but the substantive provisions remained the same.

On April 14, 2016, the Court granted the parties' joint motion for an extension of a deadline, and again amended the December 11, 2015 Consent Decree. [Doc. Nos. 140 & 141]. The substantive provisions again remained unchanged.

On June 27, 2016, the United States filed the instant Motion for Order to Show Cause [Doc. No. 144], contending that the School Board and Dr. Vidrine had violated the terms of the December 11, 2015 Consent Decree, as amended on January 12, 2016; March 24, 2016; and April 14, 2016.[4]

---

[3]The December 11, 2015 Consent Decree, as amended, is at issue in the instant motions. Any general reference by the Court to the "Consent Decree" refers to the December 11, 2015 Consent Decree.

[4]The parties sometimes refer to "amendments" to the December 11, 2015 Consent Decree, and sometimes refer to the amendments as "Amended Consent Decree," "Second Amendment Consent Decree," etc. To avoid further confusion, as noted above, any reference by the Court to the "Consent Decree" refers to the substantive provisions of the December 11, 2015 Consent Decree, as amended by the deadline extensions on January 12, 2016; March 24, 2016;

The United States moves the Court to order the School Board members and Dr. Vidrine to show cause why they should not be held in contempt for failing to meet the deadlines and cure their noncompliance with Sections VI.A.2.i, VI.A.2.ii(2)(b), VI.A.2.iii, VI.D.1.i, VI.D.1.ii, VI.D.1.iv, VI.C.1.v, and V.B.2 of the Consent Decree. The United States moves the Court to order the School Board members and Dr. Vidrine to pay a civil fine of $100 per day for each day that they continue to fail to comply with the Consent Decree and double that as a fine for each calendar week of continued noncompliance.[5] Finally, the United States moves the Court to order the School Board and Dr. Vidrine to extend the deadline for the submission of applications for the Medical Magnet Program for the 2016-17 school year to at least one month after the District has cured its related noncompliance.

The School Board filed a response. [Doc. No. 152]. The School Board contends that it acted through Dr. Vidrine and his staff, that any failures were not the result of conscious refusal or indifference, and that partial, if not total, compliance with the Consent Decree has been achieved. The School Board argues further that civil contempt is not appropriate because neither it nor the staff refused to comply, the Consent Decree is a lengthy document, the School Board was inexperienced, Dr. Vidrine was inexperienced as a Superintendent, there has since been substantial compliance, and everyone acted in good faith.

The Court held an evidentiary hearing on July 6, 2016. Testimony was taken regarding what the Consent Decree provided for teacher and administrator assignment and related issues and where

---

and April 14, 2016.

[5] The United States did not move for sanctions until a two-week period had passed, but that time period is long over.

the parties stand with reference to compliance on those issues. The School Board and Dr. Vidrine were ordered to provide a report to the Court and the United States on August 19, 2016, on the assignment of teachers and administration (including Deans of Students) as of August 15, 2016. The hearing was set to resume on September 19, 2016. However, on that date, Dr. Vidrine's recently enrolled counsel appeared and moved for a continuance. The Court granted the continuance and re-set the hearing to October 12, 2016.

On October 10, 2016, two days before the reconvened hearing, Dr. Vidrine filed a Motion for Judgment on the Pleadings [Doc. No. 170]. Dr. Vidrine argues that the Court, even after finding contempt, is required to exercise the least possible power to achieve compliance. Therefore, the United States should have first proceeded against the District (i.e. the School Board as an entity) before moving the Court to hold the individual School Board members and Dr. Vidrine in contempt. Dr. Vidrine claims that the District is in "substantial compliance," and, thus, the Court should not impose individual coercive sanctions against him (or the individual School Board members).

On October 12, 2016, the United States, the School Board, and Dr. Vidrine entered certain factual stipulations prior to the hearing. The Court then heard testimony from witnesses. At the close of the hearing, the Court deferred ruling on the Motion for Order to Show Cause and took Dr. Vidrine's Motion for Judgment on the Pleadings under advisement.

On October 18, 2016, the Court held a status conference with counsel. At the conclusion of the conference, the Court ordered the District to file the school faculty rosters, summary pages/threshold reports, declarations of Dr. Vidrine or the principals (or assistant principals, if applicable), and any birth certificates under seal no later than October 25, 2016.

On October 13, 2016, the School Board filed a "Motion for Relief under FRCvP 12(c) and

(d)" [Doc. No. 181]. The School Board moves the Court to dismiss the United States' Motion for Order to Show Cause on the pleadings, or, alternatively, under Rules 12(d) and 56. The School Board contends that the motion filed by the United States fails to describe or state a legally assertable *prima facie* claim against the School Board or its individual members. The School Board contends further that the evidence adduced in open Court shows that the School Board "yielded to and tasked the Superintendent, as it is required to do by state law, to determine and implement all matters regarding staff assignments, to compile and submit all information and data required for compliance, to confirm the accuracy and completeness of the information and data, and to address errors." *Id.* at p. 2.

On October 25, 2016, Dr. Vidrine filed school faculty rosters, summary pages/threshold reports, declarations, and birth certificates under seal. [Doc. No. 180].

On November 1, 2016, the School Board filed a response [Doc. No. 184] to Dr. Vidrine's Motion for Judgment on the Pleadings. The School Board denies that it, as an entity, and the individual members must be found in contempt before Dr. Vidrine can be found in contempt. The School Board points out that, under La. Rev. Stat. 17:81A(3) & P, Dr. Vidrine had the absolute authority to make the necessary staffing assignments required to desegregate the teachers and school administrators. They argue further that efforts to disrupt the School Board by having a member removed and attempts by others to intervene in this matter did not prevent Dr. Vidrine from completing his tasks under the Consent Decree.

On November 14, 2016, the United States responded to Dr. Vidrine's October 25, 2016 document/information production. The United States identified some apparent discrepancies in the reports, as well as 25 teachers who did not identify their races. [Doc. No. 188]. Dr. Vidrine replied

there were no discrepancies, offered an explanation for the confusion on five teachers, pointed out that some of the persons for whom surveys were requested are actually long-term substitutes, and denied that the completion of additional surveys would be helpful. [Doc. No. 189].

On November 18, 2016, the Court held another status conference with counsel, at which time the School Board and Dr. Vidrine were instructed to have the remaining surveys completed by December 2, 2016.  The United States was required to provide a list of any remaining deficiencies to counsel for the School Board and Dr. Vidrine by December 9, 2016.

On December 8, 2016, the United States filed a Motion for Further Relief [Doc. No. 195].[6] In this motion, the United States reiterates some of its earlier arguments contained in the Motion for Order to Show Cause, as well as adding other arguments.

On December 13, 2016, the Court held another status conference with counsel.  The Court instructed the United States' counsel to provide a list of all remaining current deficiencies to counsel for the School Board and Dr. Vidrine by December 23, 2016. This list was to identify the United States' specific concerns, so that the District could take action as soon as possible to resolve the concerns.  The Court set a deadline of January 12, 2017, for the School Board and Dr. Vidrine to respond.  The Court set another telephone status conference for January 13, 2017.

On January 12, 2017, the School Board and Dr. Vidrine each filed opposition memoranda to the United States' Motion for Further Relief.  [Doc. Nos. 198 & 199].

On January 13, 2017, the Court held another status conference with counsel.  At the conclusion of the conference, the Court instructed the United States to file a proposed order
> which will address all remaining alleged deficiencies, in detail and with specificity,

---

[6]This motion will be addressed separately.

>no later than January 20, 2017. The School Board and Vidrine shall file a response to the proposed order no later than January 27, 2017. The responses (1) shall address, in detail and with specificity, any objections to the proposed order and the basis for those objections, (2) shall state whether an evidentiary hearing is requested, and (3) if an evidentiary hearing is requested, shall identify proposed witnesses and what evidence such witnesses are anticipated to provide.

[Doc. No. 200].

On January 19, 2017, the United States filed its proposed order [Doc. No. 201].

On January 27, 2017, Dr. Vidrine and the School Board filed oppositions to the United States' proposed order, as well as their own proposed order. [Doc. Nos. 202 & 203].

## II.     RELEVANT LAW

### A.     Consent Decrees

Consent decrees are both contracts and legal instruments. *United States v. Alcoa, Inc.*, 533 F.3d 278, 283 (5th Cir. 2008). Therefore,

>Courts should not impose their own terms within a consent decree and should read consent decree terms by their plain meaning. . . At the same time, consent decrees are more than contracts. They are also enforceable judicial orders.

*Id.* at 286 (citations omitted). "[D]istrict courts have the power and ordinarily must hold parties to the terms of a consent decree. . . [and] have wide discretion to enforce decrees and to implement remedies for decree violations." *Id.* That is, "while a district court generally lacks authority to rewrite the terms of a consent decree, it has broad discretion to fashion equitable remedies to enforce a consent decree in response to a party's noncompliance." *Chisolm ex rel. CC v. Greenstein*, 876 F. Supp. 2d 709, 720 (E.D. La. 2012) (citing *EEOC v. Local 580, Int'l Assoc. of Bridge, Structural & Ornamental Ironworkers*, 925 F.2d 588, 593 (2d Cir.1991)). "These remedies 'need not match those requested by a party or originally provided by the court's earlier judgment.'" *Id.* (quoting

*United States v. Alcoa*, 533F.3d 278, 288 (5th Cir. 2008) (other citations omitted).

### B. Contempt

A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order. *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995); *Martin v. Trinity Industries, Inc.*, 959 F.2d 45, 47 (5th Cir. 1992).

Contempt proceedings may be civil or criminal, and the fact that consent decrees can be enforced as civil contempt does not allow the court to disregard the differences between criminal and civil contempt or the differing protections which may attach.

The Fifth Circuit has explained the difference between civil and criminal contempt[7] and the effect on a party's due process rights as follows:

> [T]he initial touchstone for determining the due process rights of a sanctions defendant lies in the characterization of the particular contempt as either "civil" or "criminal":
>
> Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required. To the extent that such contempts take on a punitive character, however, and are not justified by other considerations central to the contempt power, criminal procedural protections may be in order.

*International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 831 (1994); *see*

---

[7] In this case, there are allegations of indirect contempt that occurred outside the Court's presence. Direct contempt that occurs in the court's presence may be immediately adjudged and sanctioned summarily, *see, e.g., Ex parte Terry*, 128 U.S. 289(1888), and, except for serious criminal contempts in which a jury trial is required, *Bloom v. Illinois*, 391 U.S. 194, 209-210 (1968), the traditional distinction between civil and criminal contempt proceedings does not apply. *Cf. United States v. Wilson*, 421 U.S. 309, 316 (1975).

11

*also Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) (in a contempt action, as in any other, "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings").

"A contempt fine . . . is civil and remedial if it 'either coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.' Where the fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Id.* at 227 (quoting *Bagwell*, 512 U.S. at 829) (other citations omitted).

A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence that (1) a court order was in effect, (2) the order required certain conduct by the respondent, and (3) the respondent failed to comply with the court's order. *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (citation omitted). Clear and convincing evidence is "that weight of proof which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) (citation omitted). A party need not have acted willfully if he "actually failed to comply with the court's order." *American Airlines*, 228 F.3d at 581 (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984).

Judicial sanction for civil contempt may be employed to "coerce the defendant into compliance with the court's order and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947).

Specifically in the enforcement of decrees, the Fifth Circuit has instructed:

Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt. Discretion . . . must be left to a court in the enforcement of its decrees. . . .

*Cook v. Oschner Foundation Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977) (citing *United Mine Workers*, 330 U.S. at 303-304).

    C.    **All Writs Act**

To the extent that the United States moves the Court to find Dr. Vidrine in contempt, it does so under the power of the All Writs Act which provides "power [to] a federal court to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977); *see also* 28 U.S.C. § 1651(a). This power extends to non-parties "when their conduct frustrates the court's order." *Moore v. Tanigpahoa Par. Sch. Bd.*, 2013 WL 141791, at *6 (5th Cir. Jan. 13, 2013). (Citing *N.Y. Tel.*, 434 U.S. at 174). In order for the district court to act, three elements must be satisfied. "First, 'the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires.'" *Id.* (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (alteration in original)). "When alternative means of relief are available, the court should not issue a writ." *Id.* "Second, the party seeking the writ must meet its 'burden of showing that [its] right to issuance of the writ is clear and indisputable.'" *Id.* at *6-7 (quoting *Cheney*, 542 U.S. at 381 (citation and internal quotation marks omitted)). "Third, assuming the petition meets the first two requirements, a court should exercise discretion before issuing a writ to ensure it 'is appropriate under the circumstances.'" *Id.* at *7 (quoting *Cheney*, 542 U.S. at 381) (citation omitted)). "Generally, a writ is appropriate when it addresses a direct affront to a district court's order." *Moore v. Tangipahoa Par. Sch. Bd.*, 507 Fed. App'x 389, 397 (5th Cir. 2013) (citing *United States v. Hall*, 472 F.2d 261, 262-64 (5th Cir.1972) (finding an injunction under the All Writs Act proper in the desegregation context to prevent a member of a militant group from intentionally

13

violating a court order denying his entry into a high school campus)); *see also Valley v. Rapides Parish Sch. Bd.*, 646 F.2d 925, 943 (5th Cir.1981) (upholding injunction under All Writs Act against non-parties from interfering with desegregation order by permitting sham custodial arrangements designed to enable parents and students to avoid compliance with court-ordered student assignment plan).

**III.    ANALYSIS**

The United States contends that the School Board and Dr. Vidrine violated the Consent Decree as follows:

(1) Failed to meet 90% of the deadlines set forth in the consent decree between December 15, 2015, and June 6, 2016;

(2) Failed to take required steps to desegregate the District's faculty (a) by reviewing the racial make-up and credentials of their faculty as set forth in Section VI.A.2.i (b) by revising and finalizing the plan to desegregate their faculty by persuading teachers and administrators to voluntarily transfer schools as required by Section VI.A.2.ii(2)(b), and (c) by submitting a mandatory faculty reassignment as required by Section VI.A.2.iii;

(3) Failed to take required steps to improve the Medical Magnet Program;

(4) Failed to take required steps to equalize access to specialized academic programs; and

(5) Failed to comply with Section V.B.2 of the Consent Decree, which requires the School Board to give the ICM the information and personnel she needs to timely report information as required by sections VI.C.2, VI.D.2, and VII.

[Doc. No. 144-1].

After hearing testimony, reviewing the record in this matter, listening to the arguments of counsel, and holding numerous status conferences, the Court finds that the School Board and Dr. Vidrine failed to meet a number of deadlines and did not otherwise fully comply with all provisions

of the Consent Decree. This is certainly a disappointment and has necessitated the Court's involvement to a far greater extent than is usual in a desegregation case when only one *Green* factor remains.

On the other hand, the Court recognizes that there were a number of years of inaction in this case, during which time the United States affirmatively indicated that it would take no further action. Further, as pointed out, the Consent Decree is extensive, a number of the School Board members were new, and Dr. Vidrine was a new Superintendent (and thus inexperienced with desegregation issues). It does not appear to the Court that the School Board (as an entity or the individual members) or Dr. Vidrine flatly refused to comply with the Consent Decree and remaining desegregation obligations, but, rather, was not focused on those obligations when faced with other concerns.

At this time, the School Board and Dr. Vidrine have made substantial efforts to comply with the Consent Decree and address the remaining factor of teacher and administrator assignments. Specifically, it appears to the Court that the School Board and/or Dr. Vidrine have now taken a number of actions, including, but not limited to, the following:

- Reviewed the racial makeup and credentials of their faculty;

- Prior to the 2016-2017 school year, sent letters to teachers offering a $3,000 lump sum payment as incentive to voluntarily transfer schools for a three-year commitment;

- Reassigned teachers pursuant to a plan which brings all schools except for one into the acceptable 15% +/- standard deviation;

- Reassigned or promoted/demoted administrators in an effort to desegregate;

- Either implemented or have taken proactive steps for the implementation of expert

15

recommendations for the Medical Magnet Program, including establishing a partnership between the Medical Magnet Program and two hospitals, St. Francis and LSU-E.A. Conway[8], posting easily viewable and accessible information about the Medical Magnet Program on the District and all high school websites, setting a date for construction on significant facility upgrades to begin in June 2017, and posting a program director job description;

- Posted the District-wide course offerings, including gifted and talented offerings, on the District's website and the registration handbook with District-wide course offerings on each high school's website;

- Implemented all but 2 of the 35 recommendations made by the IDRA, and Dr. Vidrine has been in further email communication with the IDRA;

- Have worked with the ICM, so that she has been able to provide the Court with extensive reports.

While the Court remains committed to overseeing the District's complete compliance, based on all of the circumstances, the Court finds that no civil coercive sanctions are warranted for the remaining, limited areas of non-compliance. The remaining relief requested by the United States in the instant motion is an extension of the deadline for the Medical Magnet Program applications for the 2016-17 school year, which is moot. Finally, the United States did not request, and the Court does not find appropriate, the initiation of criminal contempt proceedings for the District's former non-compliance.

IV.   **CONCLUSION**

---

[8] The District attempted to establish a partnership with Glenwood Regional Medical Center as well, but was refused.

For the foregoing reasons, the United States' Motion for Order to Show Cause [Doc. No. 144] is DENIED, and Dr. Vidrine's Motion for Judgment on the Pleadings [Doc. No. 170] and the School Board's Motion for Relief under FRCvP 12(c) and (d) [Doc. No. 181] are DENIED AS MOOT.

MONROE, LOUISIANA, this 22nd day of March, 2017.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE