# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **JIMMY ANDREWS, ET AL.** | **CIVIL ACTION NO. 65-11,297** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **MONROE CITY SCHOOL BOARD, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

Pending before the Court are cross-motions filed by the United States Department of Justice ("DOJ") and the Monroe City School Board ("MCSB"). The DOJ filed a Motion for Further Relief [Doc. No. 211] under the Second Amended Consent Decree to address MCSB's compliance with the provisions regarding the Carroll High School Medical Magnet Program. MCSB, joined by individual Defendant, Dr. Brent Vidrine ("Dr. Vidrine"), filed a Motion to Terminate Judicial Supervision and to Declare the Monroe City School District Unitary ("Motion to Terminate") [Doc. No. 221]. Individual Plaintiffs Annie Faye Harris ("Harris") and Benya F. Marshall ("Marshall") have been notified of all proceedings, but neither Plaintiff has made any filings.[1]

For the following reasons, the Court finds that the Monroe City School District ("the District") has achieved unitary status in the sole remaining area of teacher and principal assignments. The Court further finds that the MCSB has achieved substantial compliance with the Second Amended Consent Decree [Doc. No. 141], such that further judicial supervision is unnecessary. Accordingly, the DOJ's Motion for Further Relief is DENIED, and MCSB's Motion to Terminate

---

[1] Marshall attended a conference with counsel and the Court, at which she actively participated, but neither Plaintiff filed any pleadings or participated in the hearing on these pending motions.

is GRANTED.

I.     **PROCEDURAL HISTORY**

For more than 50 years, MCSB has operated the District under a desegregation decree. On August 5, 1965, a complaint was filed in the name of then-minor students, Jimmy Andrews and Tommy Ray Robertson, by their mothers, against the City of Monroe ("the City"), the Mayor, the members of the School Board, and the Superintendent. On September 17, 1965, the Court issued a permanent injunction prohibiting Defendants from operating a bi-racial school system.

On August 1, 1969, the Court issued a desegregation decree. In this decree, the Honorable Ben C. Dawkins, Jr., approved a modified desegregation plan proposed by the School Board, which provided:

(1)     Following a zoning plan proposed by the Monroe City School Board;

(2)     Allowing any student in the majority race at his school to transfer to a school where he would be in the minority race;

(3)     Refusing students the opportunity to transfer from a school in the District to a school under the direction of the Ouachita Parish School Board;

(4)     Allowing the School Board to appoint a bi-racial advisory committee to assist in the desegregation of schools; and

(5)     Submitting a plan by February 1, 1970, to accomplish full integration or desegregation of the school system.

The August 1, 1969 decree was subsequently modified on November 4, 1969; February 11, 1970; February 24, 1970; August 5, 1970; July 30, 1971; January 27, 1972; August 16, 1973; August 30, 1973; August 15, 1988; June 7, 1989; July 6, 1992; April 29, 1998; August 4, 1998; December

18, 2000; July 26, 2000; August 8, 2005; March 30, 2010; July 25, 2011; June 20, 2012; December 11, 2015; March 24, 2016; and April 14, 2016.

On February 16, 1970, the DOJ intervened as amicus curiae. On May 11, 1978, the Court granted DOJ's motion to formally intervene, and DOJ has been active in the case since that time.

On July 6, 1992, the Honorable Tom Stagg granted MCSB's motion for unitary status in part and declared the District unitary in the areas of facilities, extracurricular activities, and hiring and retention of teachers and administrators. Judge Stagg denied MCSB's motion in part, finding that the District was not unitary in the areas of teacher and principal assignments, student assignments, and transportation.

On July 9, 1998, Marshall and Harris were permitted to join the case as individual Plaintiffs and remain actively involved.

On March 26, 2010, the DOJ and MCSB filed a proposed Consent Decree with the Court. Plaintiffs did not object. On March 30, 2010, the Court signed the Consent Decree [Doc. No. 16], which again modified the August 1, 1969 Decree. The Consent Decree provided for specific actions to be taken by the School Board, culminating in a review of the District's unitary status at the end of June, 2014. Among other items, the parties agreed that the "District will offer the same courses at every high school in the District, including, but not limited to AP, pre-AP, Honors, Dual Enrollment, and Distance Learning courses." *Id.* Information about the course offerings was to be disseminated to junior high and middle school students beginning in the seventh grade. *Id.* Additionally, MCSB agreed to "work with the Equity Assistance Center of the Intercultural Development Research Association (IDRA) in order to ensure that all students have equitable opportunity to participate in Gifted, Honors, pre-AP, and AP programming at all schools in the

District." *Id.*

On July 25, 2011, the Court issued an Order [Doc. No. 38] granting the School Board's Motion for Partial Relief from Judgment, again modifying the August 1, 1969 Decree, to provide for the reassignment of sixth grade students at Cypress Point Elementary School to Sallie Humble Elementary School for the 2011-2012 school year. Additionally, the School Board was directed to "petition the Court to approve the School Board's proposed comprehensive attendance plan for implementation prior to the commencement of the 2012-2013 school year." *Id.*

Subsequently, MCSB retained a demographer, Michael Hefner ("Hefner"), to assist in the development of a new attendance zone plan. After Hefner completed his report and made his recommendations to MCSB, on May 25, 2012, in compliance with the Court's July 25, 2011 Order, MCSB filed a Motion for Partial Relief from Judgment [Doc. No. 48]. The DOJ did not oppose the motion, but Plaintiffs did oppose the motion. [Doc. No. 51]. The School Board also filed a reply memorandum [Doc. No. 52]. After review, on June 20, 2012, the Court granted the motion, making certain zoning changes, which remain in place.

Between 2010 and 2014, MCSB filed the annual October 15 status reports required by the Court's August 14, 2008 Order and the annual June 30 status reports required by the March 30, 2010 Consent Decree. Neither the DOJ nor the individual Plaintiffs raised any concerns during this time period about the *Green* factors or MCSB's compliance with the March 30, 2010 Consent Decree.

On May 13, 2014, the Court issued a minute entry [Doc. No. 75]. In that entry, the Court stated:

> The parties' March 30, 2010 Consent Decree remains pending before the Court. In its June 19, 2012 Minutes [Doc. No. 55], the Court previously instructed the parties to identify and address any unresolved issues which would prevent the Court from

4

conducting a unitary status review on or after June 30, 2014. If the parties could not resolve the issues amicably, they were instructed to notify the Court and request a hearing. The parties have not contacted the Court about unresolved issues, nor have they requested a status conference on this topic. Accordingly, the Court anticipates that the parties will file a joint motion for unitary status on or after June 30, 2014. **If the Department of Justice, the Monroe City School Board, or the individual Plaintiffs have any remaining concerns about issues related to the *Green* factors, they must file a motion for a status conference immediately.**

*Id.* (emphasis added).

On July 22, 2014, the Court held a telephone status conference with the parties. At the conclusion of the conference, the Court instructed MCSB to file either a motion for unitary status or a joint status report by August 18, 2014. [Doc. No. 79]. The DOJ did not raise any concerns at that time.

On August 15, 2014, a status report [Doc. No. 80] was filed. MCSB's counsel reported that MCSB had not communicated "a desire or interest in seeking to have this Court declare the School District unitary" and had not authorized him to file a motion. Because there were contested elections for MCSB seats that fall, the Court delayed further action until after the first of the year.

On January 12, 2015, after elections were held, the Court conducted another telephone status conference. [Doc. No. 83]. Counsel for MCSB reported that a number of seats had been filled with new members and asked for further time to discuss the unitary status review with the newly-elected MCSB. The DOJ did not raise any concerns at this time.

On February 2, 2015, the Court held yet another telephone status conference with counsel. [Doc. No. 84]. Counsel for MCSB requested additional time to throughly consider and review its desegregation status. The DOJ had no objection, nor did counsel for DOJ raise any concerns.

On May 13, 2015, the Court held another telephone status conference with counsel. [Doc.

5

No. 85]. Counsel for MCSB reported that his client did not intend to file a motion for unitary status. The DOJ requested information about the capital outlay for schools in the District. At that time, the Court informed counsel of its intent to conduct a hearing, *sua sponte*, to consider whether the District is unitary.

On June 15, 2015, the Court held a fifth telephone status conference. [Doc. No. 86]. Although counsel reported the Court's intent, the MCSB did not wish to file a motion. The DOJ's counsel specifically informed the Court that the DOJ did not intend to take any further action. Accordingly, the Court set an evidentiary hearing for September 21, 2015, at 9:30 a.m. [Doc. No. 87]. The Court also set a pre-hearing conference for September 8, 2015.

On August 12 and 28, 2015, upon motion, the Court granted leave for the DOJ to enroll additional counsel.

On September 8, 2015, the Court held a pre-hearing conference. [Doc. No. 97]. Counsel for MCSB attended in person, while counsel for the DOJ attended by telephone. An expert retained by MCSB, Dr. William Gordon, also attended by telephone. During this conference, Dr. Gordon informed the Court that he could not attend the hearing on the date presently set. However, the Court explained to counsel that it wished to proceed, at least in certain areas, on that date. Then, for the first time since 2010, the DOJ raised concerns about MCSB's compliance with the March 30, 2010 Consent Decree. The Court instructed counsel to work together over the following week and to email a joint status report to Chambers no later than September 14, 2015.

An issue was also raised that Harris and Marshall had been unrepresented since the death of their counsel. Following the conference, MCSB's attorney, Douglas Lawrence, provided the addresses for Harris and Marshall, and the Clerk of Court updated their contact information.

On September 14, 2015, counsel emailed a joint status report to Chambers.[2] [Doc. No. 102]. In that report, they discussed the exchange of information and requested a continuance of the hearing to allow the DOJ additional time to review and analyze information. They also raised concerns about the concentration of white faculty and staff in the schools that serve the majority of the District's white students, the concentration of white students at a small number of schools, and MCSB's alleged failure to comply with the March 30, 2010 Consent Decree.

On September 15, 2015, the Court issued a minute entry [Doc. No. 98] stating that the evidentiary hearing would go forward on September 21, 2015, as scheduled.

The hearing was held on September 21-22, 2015. During those two days, the Court heard testimony from MCSB Superintendent Brent Vidrine ("Dr. Vidrine"); MCSB Transportation Manager Michael Felton, MCSB members Rodney McFarland and Brenda Shelling; MCSB Human Resources Director Phedra Brantley; Principal Patrick Taylor of Carroll High School; Principal Whitney Martin of Neville High School; Principal Tammie McDaniel of J.S. Clark Magnet Elementary School; Principal Toni McCarty of Lexington Elementary School[3]; former MCSB member Jessie Handy; and Plaintiffs Harris and Marshall. At the conclusion of the hearing, counsel were permitted to make closing arguments, and the Court took the matter under advisement. The Court issued a Ruling and Judgment [Doc. Nos. 106 & 107] on September 25, 2015, declaring the District unitary in the areas of transportation and student assignments, but finding that the District had not yet achieved unitary status in the area of principal and teacher assignments and had not fully

---

[2]The report was filed in the record on September 21, 2015.

[3]All of the principals, except Mr. Taylor, are assigned to schools with a significant number of white students, as compared to the other schools in the District.

complied with the March 30, 2010 Consent Order. The Court ordered the parties to file a jointly proposed consent decree or a status report.

On December 11, 2015, the Court approved the Consent Decree [Doc. No. 113] proposed by the parties.

On March 24, 2016, on joint motion, the Court approved and entered an Amended Consent Decree [Doc. No. 133].

On April 4, 2016, the Court conducted a hearing on a motion [Doc. No. 121] by the Neville Alumni and Friends Association, Greg Jones, and Nici Hanks to intervene in this matter. After hearing testimony and full briefing, on April 12, 2016, the Court denied the motion. [Doc. Nos. 137 & 138].

On April 14, 2016, on joint motion, the Court approved a Second Amended Consent Decree [Doc. No. 141]. The Second Amended Consent Decree remains in place.

On May 18, 2016, the Court held a status conference with counsel to discuss compliance with the Second Amended Consent Decree.

On June 24, 2016, the DOJ filed a Motion for Order to Show Cause why MSCB, the individual Board members, and Dr. Vidrine should not be held in contempt for failing to comply with the Second Amended Consent Decree. After holding status conferences and receiving a response from the MCSB, the Court initiated an evidentiary hearing on July 6, 2016. However, the hearing was continued until September 2016.

After additional status conferences, the Court again attempted to go forward with the hearing on September 19, 2016. However, on that date counsel enrolled on behalf of Dr. Vidrine individually and requested a continuance. The Court granted a continuance to October 12, 2016, at

which time the Court took other evidence and testimony. Both Dr. Vidrine and MCSB filed motions for judgment on the pleadings. [Doc. Nos. 170 & 181]. After a number of further status conferences and actions by the parties, on March 22, 2017, the Court denied the DOJ's Motion for Order to Show Cause and denied the motions for judgment on the pleadings as moot.

On September 22, 2017, the DOJ filed the instant Motion for Further Relief [Doc. No. 211]. On September 26, 2017, MCSB sought leave of Court to file the instant Motion to Terminate [Doc. No. 221], which was granted on October 2, 2017. After initial briefing and status conferences, the Court set an evidentiary hearing for January 9, 2018. [Doc. No. 229]. Prior to the hearing the Court resolved the parties' discovery disputes and required the posting and filing of a public notice about the hearing.

On January 16, 2018, the parties filed a joint stipulation of documents. [Doc. No. 241].

The Court conducted an evidentiary hearing on the instant motions on January 16-17, 2018. The parties were ordered to file post hearing briefs simultaneously 21 days after the transcript of the hearing was filed. The parties were then given 10 days to file reply briefs. The parties timely filed briefs, and the Court is now prepared to rule.

## II.     LAW AND ANALYSIS

When first presented with a school desegregation case, a district court is charged with determining whether or not a school board has maintained or facilitated a dual school system in violation of the Equal Protection Clause of the United States Constitution. U.S. CONST., Amend. XIV. If the district court finds such a violation, then under *Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954), and *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955), the dual system must be dismantled, and the school board must "take whatever steps might be necessary to

9

convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 437-38 (1968).

Neither a school board's nor a district court's duty ends with the initial desegregation order. Rather, there is a "continuing duty [for school officials] to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). Likewise, the district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* (citing *Green*, 391 U.S. at 439; *Raney v. Bd. of Educ.*, 391 U.S. 443, 449 (1968)); *see also Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991) (We use the term "unitary" to refer to a school district that "has done all that it could to remedy the [prior] segregation caused by official action.") .

The goal of the district court is to return "schools to the control of local authorities at the earliest practicable date." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992). In discharging this duty, the district court considers the Supreme Court's "*Green* factors": (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; and (5) student assignments. *Green*, 391 U.S. at 435; *see also Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 250 (1991).

"The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Dowell*, 498 at 249-50; *Freeman*, 503 U.S. at 491; *Green*, 391 U.S. at 439; *Ross*, 699 F.2d at 225.

The consideration before the Court is whether the District has achieved unitary status in the one remaining area of teacher and principal assignments. The Court must further consider the

MCSB's duties under the terms of the Second Amended Consent Decree.

### A. Teacher and Principal Assignments

With regard to teacher and principal assignments, MCSB is required by modifications to the original Consent Decree to comply with the Fifth Circuit's decision in *Singleton v. Jackson Municipal Sch. Dist.*, 419 F.2d 1211 (5th Cir. 1969), and, consistent with *Singleton*, to adopt a policy which would distribute white and black teachers evenly throughout the school system. MCSB was also required to adopt a policy whereby staff and employees would be treated on a non-discriminatory basis where race, color, and national origin would not be criteria for hiring, assigning, promoting, paying, demoting, or dismissing employees.

MCSB has a non-discrimination policy, and there are no issues with that aspect of the Consent Decrees or the Court's Orders. Earlier in this case, however, the evidence was clear that administrators and principals were either unaware of the requirements of the Consent Orders, or were unaware of the procedures necessary to comply with the requirements.

At the hearing, however, Dr. Vidrine testified that since this Court's September 2015 ruling, the teacher rosters of each school are compiled and teacher assignments are tracked, so that the race or ethnicity of each teacher on a school's roster is accounted for. Dr. Vidrine confirmed that in tracking the ratio of white to black teachers on individual school campuses, the teacher rosters of individual schools are grouped according to the grade levels that they serve, "...elementary, junior high and high school" [Tr,. 22:16-17]. The grouping of schools by grade levels served is done to ensure that Singleton ratio calculations for schools were performed correctly, and within the range of deviation permitted under the Second Amended Consent Decree. [Tr. 23]. In satisfying the School District's compliance requirements, Dr. Vidrine described a system-wide effort that included

11

himself, the Human Resources Department and all school principals. [Tr. 24:23-25:2]. Summative written reports for each school, listing the race and ethnicity of each teacher, were prepared continuously to facilitate the tracking of teacher staffing assignments. [Tr. 25:3-11]. A system-wide teacher staffing report, also called a "threshold report," was compiled by the District current as of September 2017. [Tr. 57:21-59:7]. The threshold report was admitted into evidence without objection. [Tr. 59:12; Exhibit 27]. Dr. Vidrine further confirmed that, as of January 2018, there had been no substantial change in the teacher percentages (by race) or teacher staff ratios, when compared with September 2017. [Tr. 60:3-10].

Relevant to the concerns raised in its September 25, 2015 ruling, this Court now concludes that District administrators and school principals are knowledgeable of the Singleton ratio staffing obligations, and the District has followed the procedures necessary to comply with its Singleton Ratio staffing obligations specified in the Second Amended Consent Decree. [Doc. No. 141-17]. The current staffing has further resolved the problem with disproportionate assignment of white teachers to schools with larger white student populations.[4]

Likewise, with regard to principal assignments, the Court finds that the problem of disproportionate assignment has been resolved. As illustrated in the evidentiary excerpt and confirmed by the Superintendent's Court testimony, black school principals previously assigned in September 2015 to Carroll High School, Carroll Jr. High School and Martin Luther King, Jr. Junior High School have been replaced with white schools principals. Furthermore, white school principals previously assigned to Neville High School, Sallie Humble Elementary School,

---

[4]The District is comprised of an 87% black student population. There are no schools with a white majority.

Clark Magnet School and Cypress Point University School have been replaced with black school principals. At these same schools that have assistant school principals, there is an assistant principal who is of a different race, resulting in racially blended school administrations. These school administrator assignments have been in place for two consecutive school years.

The United States did not offer any opposition to MCSB's evidence demonstrating compliance with its teacher and principal/administrator staffing obligations. Because the evidence presented demonstrates that the School District has met its staffing obligations in a manner that complies with the desegregation orders, the Court finds the District unitary in the one remaining *Green* area of teacher and principal assignments.

### D. Second Amended Consent Decree

However, the DOJ argues that the District should not be declared unitary, even if the MCSB has met its obligations under the *Green* factors, because the MCSB has failed to comply with provisions of the Second Amended Consent Decree regarding the Carroll High School Medical Magnet Program ("the Medical Magnet Program").[5] Under the terms of the April 29, 1998 Order and March 10, 2010 Orders, the MCSB agreed to establish the Medical Magnet Program at Carroll High School. [Doc. No. 16, p. 5]. Under the Second Amended Consent Decree, the MCSB retained an expert, Ritha Bookert ("Bookert"), to assess the Medical Magnet Program and make recommendations. All such recommendations were to be implemented by April 15, 2016. [Doc. No. 141, p. 28; Doc. No. 241, Stipulated Exhibit 1]. However, the DOJ contends that the MCSB has

---

[5] The MCSB contends that it has met its other obligations under the Second Amended Consent Decree, including all obligations regarding equitable access and availability of course offerings and consulting with and implementing the recommendations of the Intercultural Development Research Association. The Court finds that the evidence supports that contention.

failed to comply with the requirements that the Medical Magnet Program offer unique courses not available at other schools and that Bookert's recommendation that the facility be renovated to address overcrowding.

The Medical Magnet Program is maintained in the science wing of Carroll High School and is operated under the responsibility of the school principal (now David Breithaupt)[6] and Medical Magnet Program Coordinator Shandria Newton ("Newton"). Newton has been the coordinator of the Medical Magnet Program since the Court's September 2015 Ruling. She has a master's degree in counseling and is familiar with the terms of the Court's orders pertaining to the program. As of the date of the hearing, 94 black students and 1 Hispanic student were enrolled in the Medical Magnet Program. During the previous school year, 93 black students, 2 white students, and 1 Hispanic student were enrolled in the program.

Under the Medical Magnet Program, Carroll High School is the only school in the District which has Certified Nursing Assistant ("CNA") and Pharmacy Technician training and which offers courses taught by registered nurses. Medical Magnet Program students are also offered opportunities for job shadowing, for clinical practice, to go on field trips, and to travel to local colleges and universities.

The Medical Magnet Program offers courses in Introduction to Health Occupations, Medical Terminology, First Responders, CNAs, Pharmacy Technician, and Sports Medicine. The evidence and testimony at the hearing established that, during the 2016-17 school year, Neville High School also offered the courses of Introduction to Health Occupations, First Responder, and Sports Medicine

---

[6]The Court found Breithaupt to be committed to the improvement and success of the Medical Magnet Program. While he acknowledged the difficulty of recruiting white students, he testified that he believed that these students could be recruited, especially with the new facility.

I and II. As of the 2017-18 school year, Neville no longer offers the Introduction to Health Occupations, but continues to offer First Responder and Sports Medicine courses, as does Wossman High School, the other high school in the District. However, during his testimony, Dr. Vidrine offered an explanation for this overlap. He explained that course offerings routinely changed based on State requirements. Therefore, course offerings which might have been unique to Carroll High School in the past are no longer unique because of State requirements for graduation. No school in the District offered Sports Medicine prior to the 2015-26 school year. Since 2016, however, Louisiana law requires that every high school have a trainer on staff and every student learn CPR as a graduation requirement. Every high school in the State, according to the MCSB, now offers the First Responder and Sports Medicine course.[7] After the elimination of the course at Neville, the Medical Magnet Program is the only one which offers the introductory class, and it has consistently been the only school to offer the CNA and Pharmacy Technician classes.

The MCSB has also taken significant steps toward improving the physical facilities for the Medical Magnet Program. On August 16, 2017, the MCSB entered into a contract for the construction on a new Medical Magnet Program facility, and the contractor has 270 days to substantially complete construction. A groundbreaking ceremony was held on September 28 2017, and construction (as of the date of the hearing in this matter) was anticipated for May 2018. It is not disputed that this new facility is designed to and expected to attract new students.

It is clear from the evidence and testimony that the MCSB has met the vast majority of the

---

[7]The District has explained further that there are two graduation pathways: TOPS University and TOPS Tech. Some courses, such as First Responder, are so-called "universal courses" which may be credited to either pathway. The District seeks to offer these universal courses, so as to allow students the flexibility to change from one pathway to another without losing credits.

requirements of the Second Amended Consent Decree, no small feat. Further, with regard to the programming, the MCSB has satisfied this Court that there was no intent to undermine the Medical Magnet Program, and the course offerings will serve the needs of all students. Finally, although construction is not yet complete on the new facility for the Medical Magnet Program, the Court finds that the MCSB has substantially complied with the Second Amended Consent Decree. The Decree only required some action to address the overcrowding of students,[8] but instead of renovating or perhaps bringing in temporary buildings, the MCSB has undertaken a greater burden by constructing a new $1.2 million facility.[9] It is committed by contract to proceed with that construction. Finally, the evidence and testimony established that the MCSB is committed to the Medical Magnet Program and is actively working to make the program successful. Under these circumstances, the Court finds it unnecessary to afford any further relief or to continue its supervision of the District merely because construction is not complete.

The undersigned has supervised this District for almost twenty years; has considered numerous motions; held hearings; heard evidence, both lay and expert; and carefully reviewed all that has been presented. The vestiges of the prior *de jure* discriminatory system have been resolved, the MCSB has acted in good faith, and no further purpose is served by the Court's continued

---

[8] Ritha Bookert recommended that the MCSB "[a]ddress space and overall presentation of the area where students have to train. The present space is not adequate and needs to be enhanced, moved, or retrofitted due to overcrowding of students in the laboratory area. The check off skills of students is prolonged because not enough space is available in the laboratory area to check students off." [Doc. No. 141, Stipulated Exhibit 1]. She did not recommend the building of an entirely new facility, as the MCSB has undertaken.

[9] The expert's report was not due until February 14, 2015, but the MCSB had only until April 15, 2016, to "implement all recommendations."[Doc. No. 141, p. 28]. When the recommendations included renovation, this was a very short deadline. The MCSB has not ignored the recommendation, but has actually undertaken a bigger project, which, in turn, requires greater time to complete.

supervision.

### III. CONCLUSION

For the foregoing reasons, the DOJ's Motion for Further Relief [Doc. No. 211] is DENIED. The District's Motion to Terminate Judicial Supervision [Doc. No. 221] is GRANTED. The District is DECLARED unitary in the remaining area of principal and teacher assignments. The Court finds further that the District has substantially complied with the March 30, 2010 Consent Order. The Court terminates its supervision of the District, and the case is DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 29th day of March, 2018.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE